**SABRE SHIPPING CORPORATION,**
Plaintiff,

v.

**AMERICAN PRESIDENT LINES, LTD.,**
et al., Defendants.

**No. 66 Civ. 3617.**

United States District Court
S. D. New York.

June 12, 1968.

Strasser, Spiegelberg, Fried & Frank, New York City, for plaintiff (Leon Silverman, Victor S. Friedman, Allen Isaacson and Kenneth Lipper, New York City, of counsel).

Baker & McKenzie, New York City, for defendants Japan Line, Ltd., Kawasaki Kisen Kaisha Ltd., Mitsui O.S.K. Lines, Ltd., Nippon Yusen Kaisha, Ltd., Yamashita-Shinnihon Steamship Co., Ltd. (Andreas F. Lowenfeld, New York City, of counsel).

Donovan, Leisure, Newton & Irvine, New York City, (A. Vernon Carnahan, Peter J. Gartland and John H. Wilkinson, New York City, of counsel) for defendant Maritime Co. of The Philippines.

Hill, Betts, Yamaoka, Freehill & Longcope, New York City, for defendants American Mail Line, Ltd., Java Pacific & Hoegh Lines, Klaveness Line, Knutsen Line, Pacific Far East Lines, Inc.

Kirlin, Campbell & Keating, New York City, for defendant P & O Orient Lines.

## OPINION

RYAN, District Judge:

In this suit brought under Section 4 of the Clayton Act (15 U.S.C. § 15) to recover damages for violations of Sections 1 and 2 of the Sherman Antitrust Act (15 U.S.C. §§ 1, 2), defendants have moved to dismiss the complaint for failure to state a claim under Rule 12(b)(6), F.R.Civ.P., or to dismiss or stay further proceedings in the suit pending the final determination by the Federal Maritime Commission of matters allegedly within its exclusive primary jurisdiction, and in the alternative, the Japanese shipping company defendants have moved for summary judgment.

The moving defendants are MARITIME COMPANY OF THE PHILIPPINES, a corporation engaged in the shipping business organized under the laws of the Philippines, and the five largest Japanese shipping companies organized under the laws of Japan. All the defendants, with one exception, are members of the Japan Atlantic & Gulf Conference and New York Freight Bureau (Hong Kong) Conference, and all have an agent and place of business in this jurisdiction.

Prior to 1962, these two conferences carried the vast majority of all goods shipped in these two trades and during that same period plaintiff was their most significant competition, carrying as it did, 15% to 20% of the total cargo in these trades and accounting for 80% of its business.

The suit was filed on October 29, 1966 against 37 shipping lines, members and associate members of two conferences, and against the two Conferences. The suit has been discontinued against the Conferences and most of the shipping companies.

The complaint charges that, beginning in 1962 and continuing through 1963, the defendants engaged in a combination and conspiracy to unreasonably restrain and monopolize the Hong Kong-United States and Japan-United States trade and commerce; that the object of the conspiracy was to drive plaintiff, a New York independent shipping line not a member of the conference engaged in transporting cargo by water in both trades, out of these trades; that the conspiracy succeeded in forcing plaintiff out of business and into Chapter XI arrangement proceedings, thus eliminating competition and enabling defendants to gain a monopoly over these trades. The means utilized by defendants to accomplish this is charged to be the lowering of rates in the Hong Kong-United States trade to an unreasonably low level below the actual cost of transporting the commodities. The reduction of these rates, the complaint charges, was effected by the two Conferences purporting to act under existing Conference Agreements Nos. 5700 and 3103, which had been approved by the predecessor agency to the Federal Maritime Commission. Under these agreements, the members are, under prescribed circumstances, permitted to establish and fix uniform rates as among themselves for the particular trade to which the conference relates: Conference Agreement No. 5700 could fix rates for the Hong Kong trade only and Conference Agreement No. 3103 for the Japan trade only.

It is further charged in the complaint that, in violation of the Shopping Act and their Conference Agreements, the members of both Conferences, purporting to act under their respective agreements, met and agreed to and did lower

rates for both trades, and that, when this proved unsuccessful, they achieved further rate reductions in these two trades by agreement of the members of the Japan Conference alone, which agreement was wholly illegal because it was outside the scope of its Conference Agreement No. 3103 which, as pointed out, permitted it to fix rates for the Japan trade only. Following the elimination of competition, the defendants are charged with raising the rates to their earlier level and denying United States importers and exporters the benefits of free competition.

All the agreements, it is finally charged, are outside the the scope and protection of the Shipping Act (46 U.S.C.A. § 801 et seq.) because they violate Section 18(b) (5) of the Act in that they are detrimental to United States commerce and trade and in violation of the antitrust laws.

Plaintiff seeks damages and an injunction enjoining defendants from attempting to drive plaintiff out of the shipping business involving United States commerce and enjoining defendants from instituting rate changes without first obtaining a determination from the Federal Maritime Commission that such rate changes are not detrimental to United States commerce.

Although plaintiff alleges that, during all times relevant to the allegations of the complaint, the members of the Freight Bureau and The Japan Conference purported to act pursuant to existing conference agreements, respectively FMB Nos. 5700 and 3103, approved by a predecessor agency of the Commission, the complaint really proceeds on two theories.

One is that there was a combination and conspiracy among defendants not sanctioned by any agreement approved by the Federal Maritime Commission. This is based upon the charge that defendants met in Kyoto, Japan, from October 29–November 1, 1962 under authority of their Japan Conference Agreement and allegedly agreed to effectuate reductions in the rates for the transportation of cargo from Hong Kong. Plaintiff asserts that those agreements were "wholly illegal because inter alia outside the scope of" the Japan Conference and because that agreement did not authorize defendants to fix rates for cargo originating in Hong Kong.

The second theory is that the rates fixed by defendants subsequent to November 1, 1962 were "wholly illegal because detrimental to the commerce of the United States and thus outside the scope and protection of the Shipping Act". Though admitting that the Freight Bureau and Japan Conference Agreements permit the parties to fix rates, plaintiff claims that the rates permitted by those agreements "may not, under the specific provisions of Section 18(b) (5) of the Shipping Act of 1916, as amended, 46 U.S.C. Section 817(b) (5), be so unreasonably low as to be detrimental to the commerce of the United States."

In support of their motions, defendants urge that this Court lacks jurisdiction because their rate agreements are exempt from the antitrust laws under the Shipping Act, Section 15; that whether they acted outside their agreements presents a question for the primary jurisdiction of the Commission, and that the antitrust laws do not extend to international ocean transportation unless the restraints complained of were effected within the United States and directly affected American shipping—that is, outbound trades. As a last moment argument, Japanese shipping defendants urge that summary judgment is proper as to them because they acted pursuant to sovereign directive.

All defendants, in the alternative, urge this Court to stay its hand, if it finds it has jurisdiction, until the Commission has rendered its decision in a proceeding brought by plaintiff to determine whether the rates charged in the Hong Kong trade are so unreasonably low as to be in violation of Section 18(b) (5) of the Shipping Act, and defendants charged rates other than those

on file in violation of Section 18(b) (3) of the Shipping Act, and whether they violated Sections 14, 16, or 17 of the Act.

The facts as disclosed in the affidavit and exhibits of plaintiff's president, and not contradicted by defendants, briefly stated are: [1]

Defendants, in the conduct of their operations between Hong Kong, Japan and the United States, maintain business offices in the United States and arrange in the United States for the shipment of cargo both inbound and outbound.

Plaintiff, who was in the shipping business since 1958, entered this trade in 1961. It operated in competition with defendants as a time charterer. To meet plaintiff's competition, defendants invited it to join the New York Freight Bureau. This offer plaintiff rejected. It continued so successfully to compete with defendants that on November 9, 1962, defendants, finding themselves unsuccessful in their efforts to drive plaintiff out of the field, lowered their Hong Kong rates to a non-remunerative level. On that same day, plaintiff complained to the Commission that these rates were in violation of the Shipping Act and it left the Hong Kong trade. Plaintiff left the Japan trade late in mid-1963.

After SABRE had left the trade and the competition it presented had been removed, both Conferences promptly raised their rates to the pre-reduction level, which at present exceed the rates which had been fixed by plaintiff.

SABRE was forced into Chapter X proceedings under the Bankruptcy Act.

It has paid 100% of its creditors' claims and is prepared to resume shipping.

Proceedings on the complaint of SABRE were begun by order of the Commission of December 10, 1962, to determine whether the Commission should disapprove any rate in the Hong Kong trade fixed by the New York Freight Bureau "as being so unreasonably low as to be detrimental to the commerce of the United States" in violation of Section 18(b) (5) of the Shipping Act. It was found that the Conference rates in effect on November 9, 1962 were 20% below plaintiff's rates and 34% below their own existing rates and 47.5% below those quoted at the beginning of 1962.

On June 20, 1963, the investigation was expanded to include a determination as to whether the respondents were engaging in practices in violation of Sections 14, 16 or 17 of the Shipping Act, "or which may result in the charging of lower rates than those on file with the Commission in violation of Section 18(b) (3) of the Act."

The Examiner found that for seven years and until 1962, the carrier rates in the Hong Kong trade had remained stable, and that then non-conference competition grew so intense that on August 30, 1962, the Conference reduced its rates on the commodities being carried by several non-conference carriers. The Examiner also found that the rate cutting problem came to a critical pass and that there were other equally unlawful practices employed—such as rebates, the charging of rates below those filed, and the use by conference shippers under other names of non-conference lines.

---

1. The motion brought by the PHILIP-PINE Company is supported only by an affidavit of counsel to which are attached copies of the two shipping conference agreements on file with the Commission. The motion raises no factual issues.

The motion of the Japanese defendants is based on nine affidavits of their respective corporate officers. The affidavits all state that the action of the Japanese lines in lowering and raising rates was

taken at the direction of the Ministry of Transport of Japan, by whom they are subsidized.

Plaintiff's president has submitted an affidavit setting forth the facts leading up to this suit, as well as the decision of the Hearing Examiner of the Maritime Commission in Proceeding No. 1083, Investigation of Rates in the Hong Kong—United States Atlantic and Gulf Trade, 9 Pike & Fischer Ship.Reg.Rep. 106 (4/20/67).

It was specifically found that the Japan Conference had held a meeting in Japan on November 1, 1962 at which it had agreed to reduce its rates to non-conference rates; that this was the reduction which prompted the complaint by plaintiff to the Commission; and that a further reduction was made by the Conference on December 3, 1962 at which point defendants' rates were 20% below the rates charged by SABRE, which had remained constant, and an average of 16% below those of the lowest non-conference carriers; that in a single round the Conference had reduced its rates an average of 34% that this "was no ordinary competition and that the Conference was indeed out for blood." (Examiner's Report, p. 18)

The absurdity of this action, it was noted, was that some rates to Atlantic ports from Hong Kong were less than those to the West Coast.

The Examiner found that these rate reductions were the principal causes for SABRE's leaving the Hong Kong and Japan trade. From this and from the almost immediate raising of rates which followed plaintiff's departure and which continued through 1967, he concluded that the rates fixed by defendants in 1962 were so unreasonably low as to stifle competition and be detrimental to the commerce of the United States and, therefore, unlawful under Section 18(b) (5) of the Shipping Act; that no unlawful intent was required; and that the Commission had no alternative but to disapprove such rates.

The Examiner also found that defendants had used every means to avoid simplifying or expediting the Commission proceedings and that their tactics were "a complete manual on dilatory procedures." (p. 24) He found them to have violated Sections 16 and 17 of the Shipping Act, in that they had discriminated against shippers, but not of violating Section 18(b) (3), charging rates other than those on file. He refused to entertain a proceeding under Section 15 in order to determine whether the Freight Bureau's Conference Agreement No. 5700 should be disapproved, as not within the scope of the proceedings.

The Examiner's conclusion that the Freight Bureau's tariff for certain commodities was unreasonably low was excepted to by respondents—the defendants in this action—as being moot.

At the time of the making of these motions now before us, the Commission proceedings which had been pending for five years had not been terminated. The Commission on November 3, 1967, ordered their discontinuance "on the ground of mootness, where more than five years have elapsed since the questioned rates were in effect and where relatively stable conditions have returned to the trade." But, plaintiff has not returned to the trade!

A petition filed by plaintiff for reconsideration of the Commission's decision (in which defendants refused to join) was denied on January 19, 1968. Plaintiff has appealed from that decision to the United States Court of Appeals for the District of Columbia Circuit, and the defendants have petitioned for leave to intervene.

At the outset, we dispose of the defendants' challenge to this Court's jurisdiction.

■ The antitrust laws of this country extend to any activity (unless plainly and clearly exempted by statute), whether carried on by a foreigner or a citizen, which affects the trade and the commerce of the United States; and this is so irrespective of the citizenship of the actor and the place where the activity took place (United States v. Alcoa, 2 Cir., 148 F.2d 416). "The vital question in all cases is the same: Is the combination to so operate in this country as to directly and materially affect our foreign commerce?" (United States v. Hamburg Amerikanische, C.C., 200 F. 806, at p. 807.)

■■ The technicality of which way the commerce may be moving is immaterial. The contention of the defendants is particularly fallacious since in making their plea for immunity under the Ship-

ping Act, the defendants do so on the basis of exposure to antitrust liability. Besides, the foreign defendants, by joining with American shippers under the Conference, voluntarily submit themselves to the jurisdiction of United States law. (See In re Grand Jury Investigation of the Shipping Industry, 186 F.S. 298).

■ As for the Japanese defendants, whether the alleged unlawful activities were engaged in at the direction of the Government (and the facts point otherwise) is a matter for defense, which even if established in their favor would not necessarily immunize them from prosecution or civil responsibility for acts done in United States commerce.

We come now to the defendants' argument that the Shipping Act grants the defendants complete immunity from antitrust laws when acting under an approved Conference agreement.

Section 15 of the Shipping Act, after directing the filing of all agreements including conferences' "fixing rates or controlling, regulating, preventing or destroying competition", provides that the Commission after notice and hearing may disapprove or cancel any agreement, whether or not previously approved by it that it finds to be "unjustly discriminatory or unfair * * * or to operate to the detriment of the commerce of the United States or to be contrary to the public interest or to be in violation of this chapter * * *"; that such agreements not approved "shall be lawful only when and as long as approved by the Commission; before approval or after disapproval it shall be unlawful to carry out in whole or in part, directly or indirectly, any such agreement * * *".

The only exception to the approval requirements of Section 15 is that tariff rates, fare and charges agreed upon by approved conferences, if otherwise in accordance with law, shall be permitted to take effect without prior approval upon compliance with the publication and filing requirements of Section 18(b).

It is only "agreements, modifications or cancellations lawful" under Section 15 which are exempt from the antitrust laws (46 U.S.C. § 814).

As alleged in the complaint, there is no question that the two Conference Agreements in suit come within the exception requiring no prior approval "if otherwise in accordance with law."

Section 18(b) (5), after directing the carriers to file and publish their tariffs and prohibiting them from charging other than the filed rates provides that:

"The Commission shall disapprove any rate or charge filed by a common carrier by water in the foreign commerce of the United States or conference of carriers which, after hearing, it finds to be so unreasonably high or low as to be detrimental to the commerce of the United States." (46 U.S.C. § 817(b) (5).)

This is the statute which the Hearing Examiner found had been violated by defendants.

The argument of defendants by reason of the Shipping Act runs thus: that the lawfulness of conference rates is a matter exclusively within the jurisdiction and competence of the Commission and that once the agreement fixing rates has been approved by the Commission the Conference rates are exempt from the antitrust laws until disapproved; that defendants have the lawful right under Section 15 to establish rates fixed by Conferences without prior approval of the Commission and that, even if these rates are subsequently held to be detrimental to commerce under Section 18(b) (5) as unreasonably low, defendants have immunity for their past activities.

The defendants continue in this contention that this antitrust immunity granted by Section 15 is not conditioned or limited upon a finding under Section 18(b) (5) that the rates are not detrimental to commerce and reason that this is clear from the language of Section 15 as well as from its purpose which is to permit defendants to control or limit competition by making it lawful for

them to jointly fix rates and put them into effect without prior approval. The fact that they are permitted to do so immediately, they say, cannot mean that they run the risk of being prosecuted later for antitrust violations should the rates be found unreasonably low under Section 18(b) (5). In short, defendants urge that the Shipping Act makes lawful the use of Section 15 agreements until disapproval and that Section 18(b) (5) does not make unlawful the use of such agreements which the Commission may thereafter disapprove under the criteria there applicable.

The complaint, therefore, they say, fails to state a claim because by its terms Section 18(b) (5) affords no remedy to plaintiff even if the rates are found to be detrimental to commerce; and the only penalties provided to be imposed upon a carrier is that it will not be permitted to charge the rate after Commission disapproval and that it is liable to a fine for every day it does so.

Defendants' argument in substance is that because under Section 15 they may make effective filed rates prior to approval, this means that at the time of the filing the rates are clothed with immunity under the antitrust laws without more—until that immunity is removed by the Commission finding that it does not exist.

Defendants would eliminate Section 18(b) (5) from the Shipping Act as a weapon to control the use of predatory rate-fixing practices. A predatory rate cut could be made in order to drive out a troublesome competitor, the resulting Commission investigation could be stalled (as it was here for 5 years) and, once the competitor was eliminated, the disputed rates could be raised in any amount and the Commission proceeding would be mooted, as was done here.

This, as plaintiff points out, is not the law so long as the antitrust laws are held to apply to maritime proceedings. The mere fact that agreements setting rates are permitted to take effect prior to approval, does not mean that irrespective of their effect on the commerce of the United States they may be enjoyed until the defendants are caught, only to be released from all past liability simply by discontinuing those rates. If this were the law, antitrust limitations on rate agreements, which are price fixing agreements and per se antitrust violations, would be non-existent and the shippers would enjoy an extraordinarily privileged status.

That the rates may take effect upon filing does not make them "Lawful under this section" for purposes of immunity. Certainly, this is evident in that Section 15 immunizes only those agreements which are "lawful under this section, or permitted under section 813a."

Section 813a permits dual rate contracts "after notice and hearing * * unless the Commission finds that the contract * * * will be detrimental to commerce * * * or contrary to the public interest." If dual rates under Section 813a are immunized by Section 15 only if they meet Section 813a's standards, certainly those "lawful under this section" must meet the same standard. Nor does defendants' argument that the shippers, while being told that they may safely put into effect their rates without prior approval, should not run the risk of having them exposed to antitrust prosecution, move this Court. That is a risk that any person in business affecting commerce takes. The argument comes poorly from the mouth of these defendants who, because of the Government's interest in the stability of shipping, are permitted to do things which the ordinary businessman is prohibited from doing. That something more than filing is necessary before defendants may obtain immunity is clear. "The Shipping Act contains an explicit provision exempting activities which are lawful under § 15 of the Act from the Sherman and Clayton Acts. This express provision covers approved agreements, which are lawful under § 15, but does not apply to the implementation of unapproved agreements, which is specifically prohibited by § 15. The creation of an

antitrust exemption for rate-making activities which are lawful under the Shipping Act implies that unlawful rate-making activities are not exempt.", said the Supreme Court in that landmark case decided February, 1966, Carnation Co. v. Pacific Westbound Conference, 383 U.S. 213, 216, 86 S.Ct. 781, 15 L. Ed.2d 709, of the precise question under consideration.

The Supreme Court even more recently has made this clear in Volkswagenwerk Aktiengesellschaft v. Federal Maritime Commission, 390 U.S. 261, 273–274, 88 S.Ct. 929, 936, decided March 6, 1968:

"Antitrust exemption results not when an agreement is submitted for filing, but only when the agreement is actually approved; and in deciding whether to approve an agreement, the Commission is required under § 15 to consider antitrust implications."

The Court cited Federal Maritime Commission v. Aktiebolaget Svenska Amerika Linien, 390 U.S. 238, 88 S.Ct. 1005, 19 L.Ed.2d 1071, a decision rendered on the same day, which drastically narrowed the immunity granted under Section 15. The Commission there disapproved two conference agreements because it found that their provisions would be held illegal under the antitrust laws and respondents had failed to satisfy the Commission that they were necessary to further some legitimate interest. The Commission had formulated and applied a rule "that conference restraints which interfere with the policies of antitrust laws will be approved only if the conferences 'can bring forth such facts as would demonstrate that the * * * rule was required by a serious transportation need, necessary to secure important public benefits or in furtherance of a valid regulatory purpose of the Shipping Act.' " The agreements under consideration were (1) a tying rule which prohibited travel agents from booking passage on competing individual lines and (2) required unanimous conference action for charging Commission rates. The Court rejected respondents' argument that the whole purpose of the statutory scheme behind the Shipping Act would be defeated if incompatibility with the antitrust laws could be sufficient to deny immunity. It approved the Commission's ruling that the burden was on the respondents, once the antitrust violation was established (i. e., the restriction on booking on non-conference competing lines), of coming forward with a justification for the antitrust restraint. It did this by equating the antitrust violation with being "contrary to the public interest" and so justifying denial of approval under Section 15, unless some paramount commercial objective could be established to justify such restraint.

"  *  *  *  once an antitrust violation is established, this alone will normally constitute substantial evidence that the agreement is 'contrary to the public interest,' unless other evidence in the record fairly detracts from the weight of this factor." (390 U.S. p. 245, 88 S.Ct. p. 1010)

In the face of the Commission's finding that the conference rates fixed by the defendants here were so unreasonably low as "to stifle competition and be detrimental to competition", the rate fixing as effected by defendants' agreements, even if submitted under Section 15, could not lawfully have received immunity under the Supreme Court's ruling.

These two latest decisions of the Supreme Court evidence a growing reluctance on the part of the Commission to grant immunity under the Shipping Act, where to do so will grant immunity for an antitrust violation. Mr. Justice Harlan pointed this out in his concurring opinion in Svenska where he said that he could not agree with the Court's relating the "contrary to the public interest" standard of Section 15 to the antitrust factors alone and not to shipping industry factors as well. Mr. Justice Harlan also disapproved of the Commission's placing the burden of justifying the agreement on the Conference, he being of the opinion that this should not happen at least until the Commission

had found that "in light of both shipping and antitrust factors the agreement would be contrary to the public interest."

█ We hold that no immunity from antitrust claims clothed these conference agreements so as to insulate them from this suit. On this ground, the complaint may not be dismissed.

█ The complaint, as understood by defendants, also pleads the fixing of rates by a third illegal agreement which was not on file with the Commission, the agreement by which the Japan Conference fixed the rates for the Hong Kong trade. On that theory alone, the complaint would have to stand, since even defendants do not argue that a rate which has never been filed could be exempt from antitrust stricture until disapproved.

Moreover, liberally construed, the complaint might be said to plead a violation of Sections 14(2) and (3) of the Shipping Act—"fighting ships" and predatory rate cutting which cannot be immunized by the Commission from the anti-trust laws under Section 15.

█ Then, we consider defendants' plea for a stay pending further possible Commission action at plaintiff's request on Section 15 since there is no longer anything pending before it. Defendants argue that since the complaint pleads the existence of a third illegal agreement outside of the two filed Conference Agreements, there is a threshold jurisdictional question presented for Commission decision of possible violation of Section 15, citing Carnation Co. v. Pacific Westbound Conference, supra. In *Carnation,* the Court did approve the stay of court proceedings pending a determination by the Commission of whether the defendants had unlawfully implemented an approved agreement so that in effect they were acting under unapproved agreements. (United States Navigation Co. v. Cunard SS Co., 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408 and Far East Conference v. United States, 342 U.S. 570, 72 Ct. 942, 96 L.Ed. 576.)

Even if the Commission did not precisely or technically decide whether there was such an agreement or that it was unlawful under Section 15,[2] it has decided under Section 18(b) (5) that the acts of the defendants were not "arguably lawful" and the fact that it did not rely on Section 15 does not destroy the finality of that finding. Moreover, the Commission has made quite clear that it will no longer entertain the question, irrespective of what section might be cited to it, for the reason that the rates have become stabilized and, since it has no power over the past, there is nothing further for it to do.[3]

The purpose of the stay, as *Carnation* emphasizes, is not immunity from antitrust prosecution but the avoidance of a possible conflict while the Commission is acting on the matter which is also before the Court. No such possibility exists here for the Commission has completed its action; "this particular procedural problem has become moot." "The rights which petitioner claims under the antitrust laws are entirely collateral to those which petitioner might have sought under the Shipping Act." (*Carnation,* supra, 383 U.S. p. 224, 86 S.Ct. p. 787) See also Allied Air Freight v.

---

2. The Examiner alluded to the allegation that there was an unfiled inter-conference agreement between the New York Freight Bureau (Hong Kong) and the Japan-Atlantic and Gulf Freight Conference, and stated:

"In the first place, these allegations are not within the scope of this proceeding. The Commission's order of investigation, as twice amended, refers to Sections 14, 16, 17, 18(b) (3) and 18(b) (5) but not to Section 15.

* * * Nor is there any showing that the actions taken in apparent concert with the other conference were attributable to anything other than the fact that their memberships were virtually identical and that both trades were served by the same non-conference carriers."

3. The Commission relied for its mootness holding on Cargo to Adriatic, Black Sea and Levant Ports, 2 U.S.M.C. 342 (1940), a Section 15 proceeding.

Pan Am., 2nd Cir., April 25, 1968, 393 F.2d 441.

The motion for a stay and all other motions are denied.

So ordered.