AMERICAN EXPORT–ISBRANDTSEN LINES, INC., et al., Petitioners,

v.

FEDERAL MARITIME COMMISSION and United States of America, Respondents.

No. 22402.

United States Court of Appeals District of Columbia Circuit.

Argued May 7, 1969.

Decided June 27, 1969.

Mr. Burton H. White, New York City, with whom Messrs. Elliott B. Nixon and Elkan Turk, Jr., New York City, were on the brief, for petitioners.

Mr. Kenneth H. Burns, Solicitor, Federal Maritime Commission, with whom Mr. James L. Pimper, General Counsel, Federal Maritime Commission, and Mr. Irwin A. Seibel, Atty., Department of Justice, were on the brief, for respondents. Mr. Robert N. Katz, Solicitor at the time the record was filed, and Mr. H. B. Mutter, Asst. Solicitor, Federal Maritime Commission, also entered appearances for respondent Federal Maritime Commission.

Messrs. Ronald A. Capone and Robert Henri Binder, Washington D. C., were on the brief for North Atlantic Continental Freight Conference, North Atlantic Mediterranean Freight Conference, and Outward Continental North Pacific Freight Conference, as amicus curiae.

Before PRETTYMAN, Senior Circuit Judge, and BURGER and ROBINSON, Circuit Judges.

PRETTYMAN, Senior Circuit Judge:

This case involves an order of the Federal Maritime Commission relating to ocean freight rates and charges on outbound trade from North Atlantic ports in the United States to ports in the United Kingdom and Eire. The case was enormously complicated and lengthy. The Member Lines of two Freight Conferences were parties; the investigation and hearings lasted two years; the record contained about 5000 pages, plus 1000 pages of exhibits; the examiner's initial report was 100 legal-size pages and the Commission's final report another 42 pages; and the outbound tariff in 1965 contained some 1650 items. The case as it comes to us concerns only six items, presenting three or four issues interwoven into one basic contention.

The Commission determined that the rates upon six [1] commodity items [2] and one general tariff item [3] were so unreasonably high as to be detrimental to the commerce of the United States, and ordered the carriers to cancel those rates and to file lower rates with written justifications "based upon cost, value of service, or other transportation conditions". Petitioners attack the order principally upon the ground that the Commission has misconceived its own authority under the statute and is attempting to impose a rate-making system not found in that act.

Rate-making for ocean freight is a complex problem, involving the manifold intricacies of world trade. It involves many countries, many ports, many carriers, many shippers, many commodities, and a fantastic interlacing of routes. The carriers are organized into "Conferences", which carry on the administrative phases of the trade. They are exempt from the anti-trust laws in this country. By tradition ocean rates are fixed in large measure by the carriers. The factors which fix them are likewise in large measure the necessities of the situation. It is truly said they are what the traffic will bear. World trade is between buyers and sellers in different countries. Its movement is international.

1. One item (sleds) has disappeared from the case.

2. Egg albumen, meat offal, onions, plastic sheeting, and toys.

3. General cargo N.O.S. (not otherwise specified).

No one government controls it. So, if a producer has a product wanted in another country, its movement by ocean freight depends upon the interplay of the supply and the demand. Members of the North Atlantic United Kingdom Conference (known as NAUK) carry 98 per cent of the eastbound liner cargo, practically all at contract rates, with approximately 7000 contract shippers. Proposed changes in the rates and all normal questions relating to rates are submitted to and considered by a special group or committee, consisting of one member from each steamship line, which group meets about once a week. We are told that these groups take many factors into account in a vague, undocumented way, acting largely on their own expertise. We are told [4] that the Conferences consider principally three factors—competition, value of service, and cost of service. The procedure is simple and quick. We are told that in 1966 the Conference of eastbound North Atlantic carriers (NAUK) received 174 requests for rate adjustments and granted 140 of them.

In 1961 Congress amended the Shipping Act of 1916 by inserting a section [5] reading as follows:

> "The Commission shall disapprove any rate or charge filed by a common carrier by water in the foreign commerce of the United States or conference of carriers which, after hearing, it finds to be so unreasonably high or low as to be detrimental to the commerce of the United States."

The present proceeding was brought under that section.

In its wide examination in the present proceeding the Commission found no general disparity between eastbound rates and others, but it found rather startling disparities in the general cargo N.O.S. rates (a catchall classification applying to commodities for which no specific commodity rates are specified) and in the five other items. Thus in regard to N.O.S. it found the outbound rate to be $70.75 [6] and the equivalent inbound rate to be $53.70 or, if the cargo value is very high, "32/6% ad valorem". It found, "This high N.O.S. rate is inhibiting the movement of cargo." The item "onions" is an important commodity in our export trade to the United Kingdom, but there is no westbound traffic in onions. The competition to our commerce is from Canadian ports. The Commission found the rate to be $39.50 per weight ton from North Atlantic ports of the United States, $27 from Montreal and Quebec, and $31 from Toronto.

When it found wide disparities the Commission presumed that such disparities would adversely affect the commerce of the United States. It ordered the Conference to cancel the six rates above named and to file lower rates on those items. It ordered the Conference to "file a written justification of the level of the new rates based upon cost, value of service, or other transportation conditions as outlined in the attached report."

As we understand the argument, petitioners believe that the Commission is attempting to take over the functions heretofore exercised by the Conference, as above described. They find this threat in the direction by the Commission that the Conference submit a schedule of rates to the Commission and "justify" it on the basis of costs, value of service, or other transportation conditions. Thus they see a transfiguration of their long-time, Congressionally-approved system into a new, tightly-bound method of regulation by an agency of the United States Government. We think the petitioners' fears are unfounded. Certainly the United States has a right to protect its own commerce against injury by carriers, organized or not. The Commission made exhaustive

---

4. Comm'n Rep. 4.

5. Sec. 18(b) (5), 75 Stat. 765, 46 U.S.C. § 817(b) (5).

6. Rates are determined by cargo weight (W), or by cargo measurement (M), or by whichever (W/M) produces the most revenue. Rates when stated are usually marked accordingly—W, M or W/M.

inquiry into the matter and made extensive findings. It did not depart from the traditional concepts as we have outlined them. It did not fix the rates or fix a maximum. It called upon the carriers to prepare the tariff schedules. It did not require that carriers measure the proposed rates by prescribed factors. It did not use the terms "prove" or "establish". It required "justification" for the proposed new rates, which means an explanation with supporting data; the word is much less stringent than either of the other two. Its prescription of factors was in broad familar terms—cost, value, "or other transportation conditions". "Cost" and "value" are terms used by the carriers themselves, according to this record, and the term "other transportation conditions" is certainly broad and unrestrictive, especially when coupled to the rest of the sentence by a disjunctive.

We are inclined to think the Commission would have been hard put to fulfill its statutory duty with less disturbance of the traditional practices in the trade.

Affirmed.

Circuit Judge BURGER did not participate in the foregoing opinion.