**NATIONAL ASSOCIATION OF RECYCLING INDUSTRIES, INC., et al., Petitioners,**

v.

**FEDERAL MARITIME COMMISSION and United States of America, Respondents,**

**Sea-Land Service, Inc., Pacific Westbound Conference, Intervenors.**

**No. 79–1267**

United States Court of Appeals, District of Columbia Circuit.

Argued 18 Dec. 1979.

Decided 24 Dec. 1980.

---

**23.** *See* 5 U.S.C. § 552(a)(4)(B), allowing for *in camera* inspection under the FOIA.

Edward L. Merrigan, Chevy Chase, Md., for petitioners.

Robert J. Wiggers, Atty., Dept. of Justice, Washington, D. C., with whom John H. Shenefield, Asst. Atty. Gen., and Robert B. Nicholson, Atty., Dept. of Justice, Washington, D. C., were on the brief, for respondent, United States.

John C. Cunningham, Atty., Federal Maritime Commission, Washington, D. C., with whom Brian E. Kehoe, Gen. Counsel, and Edward G. Gruis, Deputy Gen. Counsel, Washington, D. C., were on the brief, for respondent, Federal Maritime Commission.

Thomas E. Kimball, San Francisco, Cal., with whom Robert B. Yoshitomi and Richard C. Jones, San Francisco, Cal., were on the brief, for intervenor, Pacific Westbound Conference.

Edward M. Shea and Edward A. McDermott, Jr., Washington, D. C., were on the brief, for intervenor, Sea-Land Service, Inc.

Gordon M. Shaw, Atty., Federal Maritime Commission, Washington, D. C., entered an appearance, for respondent, Federal Maritime Commission.

Edward D. Ransom, San Francisco, Cal., entered an appearance for intervenor, Pacific Westbound Conference.

Before WILKEY and MIKVA, Circuit Judges and FLANNERY *, District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge WILKEY.

Dissenting opinion filed by Circuit Judge MIKVA.

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

WILKEY, Circuit Judge:

This is a case involving several cognate commodities, each of which is a raw material used by Far East manufacturers of paper products. The three raw materials—recyclable wastepaper, processed woodpulp, and virgin woodchips—travel westbound across the Pacific at widely divergent shipping rates. Petitioners are shippers who claim that their product, wastepaper, faces prevailing freight rates which are unreasonably high and discriminatory in violation of the Shipping Act of 1916 (the Act).[1] The assertedly unfavorable rates charged for shipments are fixed by a monopolistic rate-making association of carriers, the Pacific Westbound Conference (PWC), holding a limited antitrust immunity under the Act.[2] The rates for woodpulp and woodchips, on the other hand, are "open"; they are set by carriers who act independently, who must meet the competition of all steamship operators, including those outside the PWC. We are called upon to review a final agency decision and order upholding the rates fixed by the PWC.

A Federal Maritime Commission (FMC or Commission) administrative law judge (ALJ) found that the administrative record showed unreasonably high shipping rates that discriminated against wastepaper to the detriment of United States commerce in that commodity in violation of statutory provisions.[3]

The Commission has not provided a reasoned decision based on substantial evidence explaining how it could overrule its ALJ though it accepted the same basic economic predicates as found by the ALJ. The Commission engaged in wholly insufficient analysis of the harm posed to United States commerce by the high shipping rates for wastepaper—the principal flaw being the Commission's illogical disregard for the pernicious commercial effects which attend unreasonably steep freight costs. Hence, the FMC's orders declining to disapprove the challenged rates must be set aside. The Commission's laxity challenges the very character of the Act which, on the one hand, grants considerable license to carriers, and on the other, obligates the Commission to ensure that that license does not work to the disadvantage of the national commerce. The basically facile agency reversal of the ALJ, as evidenced by these formidable and unfounded rate differentials cannot stand.[4]

## I.  BACKGROUND

On 20 July 1972 the FMC initiated this inquiry to examine alleged violations of the Act.[5] The Commission's ALJ was directed to investigate violations of sections 15, 16 First, 17, and 18(b)(5)[6] possibly resulting from an unjustified differential separating monopoly wastepaper rates from competitive woodpulp rates. Petitioners had com-

1. 46 U.S.C. §§ 801 et seq. (1976).

2. See Shipping Act of 1916, § 15, 46 U.S.C. § 814 (1976).

3. The Commission shall by order, after notice and hearing, disapprove, cancel or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest, or to be in violation of this [Act]. . . .
Id. (emphasis added).
    The Commission shall disapprove any rate or charge filed by a common carrier by water in the foreign commerce of the United States

or conference of carriers which, after hearing, it finds to be so unreasonably high or low as to be detrimental to the commerce of the United States.
Id. § 18(b)(5), 46 U.S.C. § 817(b)(5) (1976) (emphasis added).

4. Petitioners also allege inappropriate ex parte contacts and FMC prejudgment of the issues in this case. We reject petitioners' allegations as entirely groundless. Petitioners failed to adduce evidence of impropriety; we presume the Commission to be honest and impartial. Withrow v. Larkin, 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975).

5. Order of Investigation, Docket No. 72–35, reprinted in Joint Appendix (J.A.) at 24–28.

6. 46 U.S.C. §§ 814, 815 First, 816, & 817(b)(5) (1976).

plained to the Commission and continue to claim before this court that the PWC had abused its limited ratemaking authority by fixing an *unreasonably* overpriced rate structure for wastepaper thereby damaging export potential for that commodity in the Far East.[7] Petitioners contended that materially lower shipping rates for a similar commodity, woodpulp, demonstrated the unreasonableness of much higher rates for wastepaper hurting their sales of the latter raw material. On 15 August 1977 the ALJ agreed, declaring that wastepaper rates should henceforth be "open," but he was reversed by the Commission, which found on 9 March 1979 that the challenged ratemaking in no way violated the Act. In addition to the principal issues under the Shipping Act outlined above, this appeal raises a subsidiary question of compliance with the National Environmental Policy Act of 1969 (NEPA).[8]

Since the Commission and ALJ proceedings are incongruous, some basic facts warrant special emphasis, because this appeal poses subtle questions of unsatisfactory agency showings of substantial evidence and reasoning in the decisionmaking process. To resolve whether the Commission upheld its statutory responsibility to disapprove unreasonable and economically deleterious rates set by a conference of carriers, we need to consider three things: (1) Is wastepaper a commodity similar to others which have more favorable shipping costs?;

(2) Do the PWC fixed wastepaper rates conform to standard ratemaking factors of cost, value of service, or other transportation conditions?; and (3) Is commerce in wastepaper impeded by materially less advantageous rates? A brief view of these considerations will allow us not only to see whether the PWC abused the limited ratemaking authority it has under the Act, but more critically, whether the FMC has ignored its statutory mandate to define those limits in the public interest and oversee the license granted to shipping conferences.

### A. Similarity and Differences of Wastepaper to Woodpulp and Woodchips

Simply and practically speaking, there is really one characterization which separates the various positions asserted in this case: it is that the Commission has been obstinately oblivious to the existence of *competition* among the various raw materials used in paper production. That competition, or "interchangeability," the argument would run, is preserved if and only if the transportation costs of those materials are reconciled with their correlative production characteristics. The considerations elaborated below will show that the FMC has viewed with a strange astigmatism the competition which wastepaper can mount against woodpulp and woodchips in the context of acceptable shipping rates in a generally expanding market.[9]

---

7. Initially the inquiry involved only shipments from the United States to Japan, but by an amendment to the *Order of Investigation* served 27 October 1972, *reprinted in* J.A. at 30–31, it was extended to include shipments to the Philippines, Taiwan, Korea, South Vietnam and Thailand.

8. 42 U.S.C. § 4321 *et seq.* (1976).

9. The major growth in the raw materials market was certainly in woodchips. Woodpulp exports as reported by PWC carriers, in fact, showed a small overall, but not particularly significant, decrease. *Cf.* FMC Report, served 9 March 1979 (Report) at 23–24 & nn. 38–39, *reprinted in* J.A. at 230–31 & nn. 38–39. Department of Commerce statistics, however, reflecting *all* U.S. wood fiber exports to the Far East (*i. e.*, not merely PWC totals) show the marginal significance of the limited negative

trend in woodpulp exports. *See Wood Fiber Exports to Japan, Korea and East Asia 1970–1976*, Appendix A, Table 1, *reprinted in* J.A. at 361. This chart clearly identifies *woodchips* as the big winner in the Far East. In Japan, for example, woodchip exports went up 62% over the seven years of the study. By contrast, wastepaper exports increased only 40%, while woodpulp increased by 11%. In light of the fact that Japan imported *no* woodchips in the mid-1960's, *see* administrative law judge's Initial Decision served 15 August 1977 (I.D.) at 34 n.36, *reprinted in* J.A. at 65 n.36, this market growth is truly meteoric.

It is helpful to distinguish early the relevancies of the *woodchip* and *woodpulp* factors to our analysis: We are interested in woodchip export data mainly because of the estimate they provide of market dimensions in the Far East. We can thereby reach conclusions about

The FMC, it must be noted, does not rule on rates applicable to woodpulp and woodchips. Woodpulp shipments are subject to "open" rates because of the existence of substantial competition. And whereas woodpulp and wastepaper travel in containers, woodchips are carried in the holds of "tramp" ships stopping when and where they please. Tramps are not common carriers, hence do not fall under the Commission's jurisdiction. But these rates and the freight movements they generate, developing as they do in the same basic competitive context, are relevant to the reasonableness and true commercial effect of wastepaper rates. The FMC does not recognize this. This is a major flaw we find in the Commission's regulatory horizons—a handicap not shared by the ALJ, as brought out below in Parts II. A. and B.

■■■ 1. *Competition.* Before we turn to the effect of price differentials in our analysis of wastepaper as a competitor, it is necessary to check whether, in any event, wastepaper can be used like woodpulp or woodchips in the production process of paper goods: in other words, is there positive cross-elasticity of demand?[10] We need to

know this, for otherwise it is not possible to say whether the rate differentials that exist are *unreasonable, or unjustly discriminatory, or unfair.*[11] The ALJ found "that wastepaper and woodpulp are similar commodities."[12] He wrote: "The two commodities are both fiber resources in the papermaking industry. They are *technologically and economically interchangeable* in the Far East market place and both are carried in the same trade."[13] The Commission could not disagree. It said: "While it is no doubt true that both commodities compete in certain end uses—*i. e.,* that *both can be used as a raw material* for the manufacture of paper or paperboard—specific grades of wastepaper can only be used to produce specific grades of pulp of a like kind and quality."[14] This court, speaking of a parallel agency, the Interstate Commerce Commission, has used the following language:

The lawfulness of the rate structures was not to be governed by the fact that recyclable products had been unable to attain actual competitive status with virgin products under existing rates. Instead, we believe that to warrant dispositive findings of no competition the Commission was required to find that the various

---

detriment to commerce—comparing the actual sales data as well as projecting what opportunities for sales might exist in the market given different transportation costs. Woodpulp, on the other hand, is an index of *reasonableness* of shipping rates. As both woodpulp and wastepaper are shipped in identical containers aboard the same PWC carriers, and they are both commodities with analogous uses in the Far East raw materials market, comparing wastepaper rates to woodpulp rates is useful.

10. We do not want, after all, blithely to compare apples and oranges. Likewise, an agency should also avoid unavailing comparisons of nonsubstitutes. Though apples and oranges are not without some analogous properties, their similarities would not suggest to manufacturers of orange juice, for instance, that apples might be an attractive, alternative raw material, given the right price. So, a preliminary question asks whether wastepaper and woodpulp or woodchips are "apples and oranges"? As the ALJ found, it seems rather plain that they are not.

11. These are the kind of rates which the Act requires the FMC to disapprove. *See* note 3 *supra.*

12. I.D. at 72, *reprinted in* J.A. at 103.

13. *Id.* (emphasis added).

14. FMC Report at 10, *reprinted in* J.A. at 217 (emphasis added). The fact that the interchangeability of wastepaper and woodpulp is somewhat circumscribed by technology (*i. e.,* that the raw materials at issue are not categorical functional equivalents over the entire range of paper manufacturing processes) does not convert the similar commodities into "apples and oranges." It appears that even the PWC understood the commodities to be similar and competitive. *See* I.D. at 97, *reprinted in* J.A. at 129. In any event, "functional equivalence" is not the standard for establishing sufficient nexus among shipped goods such that the variability in their associated shipping rates can be shown to be either reasonable or unreasonable. "Similarity" suffices. *See Investigation of Ocean Rate Structures,* 12 F.M.C. 34, 58 (1968) (citing *Iron and Steel Rates, Export-Import,* 9 F.M.C. 180, 191–92 (1965)).

products were neither actually nor potentially competitive for transportation purposes.[15]

One can only conclude, then, that wastepaper shippers sell in a market where the use of their product is commensurable with—and therefore necessarily comparable to—the only obvious substitutable alternatives around: woodpulp or woodchips.[16] Given this incontrovertible relationship among the commodities, we must proceed to examine whether they travel at different rates, and whether the differences are justifiable.

Competition, or its corollary, interchangeability, is a long run as well. as a short run phenomenon. The longer time horizon necessitates a broader perspective on the extent—and even nature—of competition. It affords the potential of demand-side adjustment. Buyers and users of raw materials can and do modify their production processes to accommodate alternative suppliers; they can even diversify their end-product line to offer their customers more attractive goods. Naturally, this broader vision of which goods compete together is contingent on relative price attractiveness (as delivered) and other factors like dependability of supply. In this case, a cheap, abundant and regular source of wastepaper is available. A controlling question, then,

for the *potential* competitiveness of wastepaper concerns the cost of delivery. An unreasonably high rate could only impair competition and suppress perceived interchangeability.[17]

But in the long run, relative shipping rates are one factor that will influence, to some degree, industrial choices to build new plants with production processes that use either higher or lower proportions of scrap versus raw materials. This factor leads logically to a finding of competition when one focuses on the long run.[18]

Over the long run, metaphorically speaking, even apples and oranges may compete notwithstanding their exclusive characteristics. Orange juice may not ever come out of an apple press, or vice-versa, but manufacturers can always retool, or consumers may always shift their drinking tastes in line with their pocketbooks. Apples and oranges, then, are sufficiently similar for fruitjuicing purposes to imply competition; perhaps more so, we can imagine, do the raw materials of papermaking.

Before continuing we point out what should be apparent, that is, the distinction of our approach from that of the Commission. For the Commission, "detriment to commerce" *vel non* was a preemptive question, which in this case terminated further exploration.[19] The correct approach, we be-

---

15. *NARI v. ICC*, 585 F.2d 522, 540 (D.C. Cir. 1978), *cert. denied*, 440 U.S. 929, 99 S.Ct. 1266, 59 L.Ed.2d 485 (1979). Naturally, the ICC and FMC are governed by different organic statutes. Nevertheless, their functions are analogous and each must sanction rates according to the indicia of the public interest. Thus, *NARI v. ICC, supra*, is controlling authority on this particular point.

16. As a virgin commodity, not yet technologically processed or adulterated, woodchips potentially displace—*i. e.*, compete with—the other two materials over the entire range of possible end uses. *See* I.D. at 21, *reprinted in* J.A. at 52. For this reason especially, the competitive universe of wastepaper must include market data on woodchips. The freight charges relevant to woodchips transported in the cargo holds of tramp ships may be inapposite to the costs of containerized transport applicable to wastepaper and woodpulp. Still, sales statistics on woodchips are validly descriptive of overall market conditions in the Far East. It is

essential to contemplate, though the FMC did not, the significance that the dramatic increase in woodchip exports holds for understanding the generalized demand for (competitive) papermaking raw materials. *See* note 31 *infra* and accompanying text.

17. *Cf. NARI v. ICC*, 585 F.2d 522 (D.C. Cir. 1978), *cert. denied*, 440 U.S. 929, 99 S.Ct. 1266, 59 L.Ed.2d 485 (1979) (potential competition may be considered by agency along with *actual* competition for transportation purposes).

18. *NARI v. ICC*, 627 F.2d 1328, 1335 (D.C. Cir. 1980) (Wilkey, J.).

19. *See* Report at 13, *reprinted in* J.A. at 220: Because the PWC rates at issue, even if unreasonable, have not been shown to result in detriment to commerce, it is not necessary to discuss the reasonableness of PWC's wastepaper rates. Our decision turns on the "detriment to commerce" standard of section 18(b)(5).

lieve, is to assay the evident similarities in the shipped goods, evaluate the applicable rates and any material differentials, *and also* judge the effect on commerce. This is not to say that the analysis need be undertaken in any particular order. The point is merely that it is difficult entirely to segregate *reasonableness* and *detriment* as the Commission has done. The trouble arises quite simply because transportation costs and commercial effects are not independent parameters with respect to related commodities. By looking at too little, the FMC stopped its analysis too soon to learn enough about the market; it reached thereby an uninformed—or, only partially informed—decision that is easily seen as erroneously incomplete after factoring in all characteristics of the effective market. Detriment to commerce is in a sensitive (inverse) relation with reasonable and fair shipping rates to the extent that related goods are competing within the same market—the dynamics are such that it is not instructive to look at one market construct oblivious to the others.[20]

2. *Reasonableness of Rate Differentials.* The original Commission Order of Investigation[21] initiated this matter in view of disparate wastepaper/woodpulp freight rates. "The rate on wastepaper is $31.25 or $37 per long ton depending on density, while the rate on woodpulp is between $14.50 and $32 per short ton, depending on the Conference carrier used."[22] The findings eventually made by the ALJ, which were in fact stipulated by the PWC, were even more dramatic. In 1971 a ton of wastepaper travelled at $31.25–$37.00 versus $14.50–$18.00 for the *same weight* of woodpulp. In 1972 the comparable rates were $33.25–$39.00 for wastepaper versus $14.50–$18.50. In 1974, $47.32–$55.80 for wastepaper compared to $27.00 for woodpulp.[23]

These rates, it must be emphasized, apply to shipments of either commodity *in containers*, and Gertrude Stein might have said: "A container is a container is a container."[24] The rate differentials for two similar commodities can be further evaluated, however, in light of other criteria: It could be that transportation characteristics or other values support the disparity in shipping costs.[25] But the ALJ found, and the Commission did not dispute, that the relevant characteristics, like volume of shipments, dependability, etc., and other values, such as the market value of the commodity transported, *did not favor* woodpulp for transportation purposes.[26] Since wastepaper is cheap, the intrinsic worth of wastepaper per shipping unit being less than for the same amount of woodpulp in the market, it is indefensible that the former is far more costly to ship than the latter.[27] "Based on

---

A footnote conceding that the ALJ found "exorbitant and outrageously high" rates is omitted. This excerpt from the FMC Report is the crux of our difficulty with the Commission's analysis.

**20.** The Commission's Office of Environmental Analysis (OEA) did appreciate the market interrelationships. The environmental impact statement prepared by the OEA was based on assumptions indicating an understanding that the competition among wastepaper, woodpulp and woodchips was complex and multivariable. *See* Report at 21–22 n.36, *reprinted in* J.A. at 228–29 n.36. We can agree with this, of course. The position taken by the FMC is definitely antithetical to the environmental interests of conservation and reducing unnecessary industrial activity, as well as to the expressed intent of Congress in this area. *See* notes 60–62 *infra* and accompanying text. We address the NEPA issue in Part II. C. 1. *infra.*

**21.** *Reprinted in* J.A. at 24–28 (served 20 July 1972).

**22.** *Id.* at 25.

**23.** *See* Chart I, Rate History, I.D. at 10, *reprinted in* J.A. at 41.

**24.** Naturally, the ALJ found that containerized wastepaper was no more costly to handle than containerized woodpulp. I.D. at 7–8, 74, *reprinted in* J.A. at 38–39, 105. "Yet," he wrote, "containerized wastepaper rates [in 1972] exceeded profitable rates on containerized woodpulp by 166% to 200% and exceeded costs by even greater percentages." *Id.*

**25.** *See id.* at 72, *reprinted in* J.A. at 103.

**26.** *See id.* at 8, 74, *reprinted in* J.A. at 39, 105.

**27.** *See id.* at 80–84, *reprinted in* J.A. at 111–15.

the foregoing considerations, the wastepaper rates were so unreasonable as to be outrageously high." [28] These poignant considerations notwithstanding, the FMC did not question or review the comparative reasonableness of wastepaper rates.

3. *Effect on Commerce.* Approximately *two-thirds* of wastepaper's delivered price in the Far East is attributable to shipping charges set by the PWC; the purchaser is paying mostly *for freight.*[29] Moreover, whereas the Far East demand for recyclables is vast, *only two percent* of Japan's wastepaper requirements are filled by exports from the United States.[30] There has been tremendous growth in the market for the raw materials used in papermaking. The dramatic spurt in woodchip exports along with an increase, less impressive to be sure, in wastepaper exports show great sales prospects.[31] Plainly, between freight costs and sales growth of competitive products, wastepaper exporters are realizing proportionately little of the market's potential.[32]

Given that the impact of high PWC rates would be to mitigate the otherwise impressive dimensions of the potential market, we need to know about the conference's monopoly status. It suffices to point out that the PWC carries about 95 percent of the wastepaper shipments, to the Far East.[33] The dominant role of the PWC in carrying this freight is ensured by the so-called "dual rate" contracts it offers to shippers. Dual rates are effective because they entail a 15 percent premium in freight costs for any shipper of wastepaper who eschews an ex-

clusive arrangement with the PWC.[34] Thus, the situation faced by wastepaper shippers can be accurately—and necessarily—characterized as one of monopolistic, and hence, inescapably high shipping rates for a commodity whose value is low relative to the freight component of delivered price.

"The findings of fact," wrote the ALJ, "detail the manifest harm suffered by wastepaper dealers as a result of PWC's rates on that commodity. In sum, the facts establish that wastepaper movement was inhibited and the dealers suffered a loss of profit." [35] It is no wonder that the ALJ found plain violations of the Act. He stated:

First, in fixing wastepaper rates so unreasonably high as to be a detriment to commerce, PWC misused its conference agreement to contravene the regulatory purpose of section 18(b)(5). In employing its agreement so injuriously, PWC operated beyond the scope of the Commission's grant of partial immunity from the antitrust laws. The abusive use of the agreement operated to the detriment of the commerce of the United States and contrary to the public interest. . . .

Second, PWC's rate making practices were unjustly unfair as between wastepaper and woodpulp shippers, exporters and importers in violation of an express provision of section 15. . . . These illegalities also operated to the detriment of the commerce of the United States and contrary to the public interest.[36]

---

Insofar as the relationship between value of commodity and freight rates is concerned, as shown by Chart II, a comparison of West Coast dealer prices for selected types of wastepaper and woolpulp in 1972, the values of wastepaper were only about 42%, 17% and 15% of the value of comparative types of woodpulp at that time, *yet the lower valued commodity in each instance took much the higher rate than the higher valued commodity.*

Id. at 24, *reprinted in* J.A. at 55 (emphasis added).

28.  *Id.* at 84, *reprinted in* J.A. at 115.

29.  *Id.* at 61, *reprinted in* J.A. at 92.

30.  *See* J.A. at 286.

31.  *See* I.D. at 20–22, *reprinted in* J.A. 51–53.

32.  *See id.* at 63, *reprinted in* J.A. at 94.

33.  *See id.* at 26, *reprinted in* J.A. at 57.

34.  PWC's contract rules have "the effect of locking wastepaper shippers into PWC." *Id.*

35.  *Id.* at 84, *reprinted in* J.A. at 115 (footnotes omitted).

36.  *Id.* at 96, *reprinted in* J.A. at 128 (footnotes omitted).

By taking a comprehensive look at the relevant market, *which includes woodchips*, the ALJ perceived the damage done to wastepaper exports by the unreasonably high rates. He appreciated the trend towards fabulous growth in the combined market for woodchips, woodpulp, and wastepaper, and saw the disproportionately small gains redounding to wastepaper. He noted, quite simply, "[t]he disparity in performance of these two nearly identical fiber resources [*i. e.*, woodchips and wastepaper] diminishes the probative value of wastepaper's increasing volume as proof showing PWC's wastepaper rates are not unreasonably high." [37]

## II. DISCUSSION

■ The Commission has taken the position that the mere existence of *some* improvement in the sales record of wastepaper precludes the required finding of "detriment to commerce." The Commission may not erect a "substantial evidence" shield around defective investigative and analytic processes. Substantial evidence is, of course, the appropriate standard.[38] But substantial evidence is not adduced by mere agency assertion. It is only mere assertion by the Commission that distinguishes its conclusion of no detriment to commerce from the ALJ's opposite conclusion premised on the same facts, but evaluated by him in a consistent and reasoned manner. Furthermore, prejudicial rates imped-

ing the flow of wastepaper can defeat the important, and obvious, public policy to encourage the commercial viability of recyclables. For this reason also, we find the rates fixed by the PWC, as sanctioned by the Commission, unsupportable by this record or the law.

### A. Legal Standard of Review

A court undertaking substantial evidence review[39] finds a somewhat anomalous administrative record when taking "a good, hard look" at agency action that contradicts the findings and conclusions drawn by the agency's own hearing examiner. An agency's decision is supported when the record *viewed as a whole* evinces substantial evidence. Here, the ALJ's decision must be considered as an important part of the whole record a reviewing court weighs in order to assess substantial evidence.[40] According to the much cited Supreme Court precedent of *Universal Camera Corp. v. NLRB*[41] this court is compelled to judge the FMC's refusal to find violations of the Act in light of the ALJ's conclusions to the contrary.

■ The importance of testimonial evidence and witness credibility to the factual findings in the instant litigation endow the ALJ's vision with particular acuity.[42] We have a situation here where an ALJ has delved deeply into the true market conditions, having and relying on the benefit of oral testimony. He heard and evaluated

37. *Id.* at 63, *reprinted in* J.A. at 94.

38. *See* 5 U.S.C. § 706 (1976).

39. The Act requires that "[o]rders of the Commission relating to any violation of this [Act] . . . shall be made only after full hearing." 46 U.S.C. § 822 (1976). Hence, the Commission must act on the basis of substantial evidence, and may not act arbitrarily or capriciously. 5 U.S.C. § 706(2)(A) & (E) (1976). *See Consolo v. FMC*, 383 U.S. 607, 618–19, 86 S.Ct. 1018, 1025–26, 16 L.Ed.2d 131 (1966); *Puerto Rico Ports Authority v. FMC*, 642 F.2d 471, 478 (D.C.Cir.1980). Under this standard, an agency must act rationally and resolve any conflicts in the evidence pursuant to statutory criteria. *See Bowman Trans., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 284–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974); *Burlington Truck Lines v. United States*, 371 U.S.

156, 167–68, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962); *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 851 (D.C. Cir. 1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

40. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 493, 71 S.Ct. 456, 467, 95 L.Ed. 456 (1951) (reviewing court determines substantiality of evidence of record including examiner's report even if report opposes agency view).

41. *Id.*

42. *See NLRB v. Universal Camera Corp.*, 190 F.2d 429, 430 (2d Cir. 1951) (remand) (examiner findings based on witness demeanor entitled to substantial weight).

the credibility of contentions that the Far East "manufacturers would use ever increasing quantities of wastepaper generated in the United States if the delivered price in those countries were lower." [43] The Commission appeared entirely to discount the hearing evidence on which the ALJ relied. The Commission simply asserted that this was hearsay testimony with "little probative value," [44] ignored the evidence, and declined to reflect on the implications. The Commission stubbornly insisted on wearing its blinders to judge the available evidence in this case. Hearsay evidence is not dispositive, of course, but it is suitable and appropriate for inclusion in the context of administrative proceedings and decision-making. The Administrative Procedure Act itself says that "[a]ny oral or documentary evidence may be received . . . ." [45]

■ Therefore, even before reaching the specific elements of the "substantial evidence" on which the Commission decided the claims based on sections 15 and 18, we hold that the Commission was arbitrary and capricious in the very way it handled the evidence in the record; the Commission unreasonably disregarded testimonial evidence of *some* probative value—evidence which was believed by the ALJ, and *not contradicted* by any evidence of a similar import. [46] The dubious conclusions reached by the Commission could only follow from the agency's facile and improper treatment of significant and uncontradicted evidence.

## B. Substantial Evidence in the Record Shows a Violation of the Act

In our examination of the record, looking for substantial evidence under the *Universal Camera* standard, it appears inescapable that unreasonably high shipping rates for wastepaper set by the PWC monopoly detract from United States Commerce in violation of section 18(b)(5) of the Act. [47]

At this point, it is worth noting that the United States, a statutory respondent, as represented in this action by the Antitrust Division of the Department of Justice, has adopted a position directly opposed to the Commission. [48] The Department of Justice characterized the Commission's rationale as a "product not only of incomplete analysis, but even more of self-induced myopia." [49] When the Department points to "the Commission's failure to consider 'all relevant factors' in reaching its decision" it is plainly correct. [50]

A question arises, however, with respect to section 15 of the Act, [51] and the application of the limited antitrust immunity provided therein. Commentators have noted a certain incongruity between the Act's definite intention to liberate the shipping industry from some antitrust constraints and the case law that tentatively reintroduces the same antitrust considerations back into the regulation of the shipping industry. [52] The case at bar does not pose the controversial section 15 issues. There is no question of

---

**43.** I.D. at 60, *reprinted in* J.A. at 91.

**44.** Report at 15, *reprinted in* J.A. at 222.

**45.** 5 U.S.C. § 556(d) (1976). "No rule should exist that evidence inadmissible in a jury case may not be substantial. Substantiality of evidence should be determined by appraising it in its full context." K. Davis, Administrative Law of the Seventies, § 14.11, at 341 (1976).

**46.** *See* I.D. at 60, *reprinted in* J.A. at 91. The Commission also refused to consider documentary evidence, *e. g.*, "letters received by PWC from wastepaper receivers in the Far East claiming that they would have to shift to woodpulp unless PWC reduced its freight rates for wastepaper." *See* Report at 15 n.24, *reprinted in* J.A. at 222 n.24. "These letters," the Commission wrote, "in no way change our position." *Id.* The Commission displayed an un-

fortunate, capricious reluctance to assimilate the proffered evidence tending to show detrimental impact on the commerce in wastepaper.

**47.** 46 U.S.C. § 817(b)(5) (1976).

**48.** *See* 28 U.S.C. §§ 2344, 2348 (1976).

**49.** Brief for the United States at 31 (footnote omitted). *See generally id.* at 23–34.

**50.** *Id.* at 34. *See also United States Lines v. FMC*, 584 F.2d 519, 526 (D.C. Cir. 1978).

**51.** 46 U.S.C. § 814 (1976).

**52.** *See, e. g.*, Note, *Antitrust and the Shipping Industry: Interpretation of the Shipping Act of 1916*, 12 N.Y.U.J. Int'l L. & Pol. 115 (1979).

retroactive antitrust liability (*i. e.*, liability for pricefixing or other restrictive agreements *after* Commission approval).[53] The legitimacy of dual-rate contracts—which the Act explicitly permits[54]—is not being surreptitiously challenged. Even the basic right of conferences to fix prices is not at stake.

Rather, only the reasonableness and deleteriousness of rates undeniably subject to Commission scrutiny and control is in issue. Both sections 15 and 18(b)(5) grant the Commission broad authority to disapprove or set aside rates seen as harmful to the public interest. As the Supreme Court wrote of section 15 in light of the 1961 amendments to the Act,[55] "[t]he scheme of regulation adopted thus permits the conferences to continue operation but insures that their immunity from the antitrust laws will be subject to careful control."[56] Happily, the issues presented here do not require us to define the boundaries of the antitrust liability of carriers under the Act—neither retroactively nor normatively.

■ Section 18(b)(5) allows an analytically simpler approach to the propriety of fixed rates which allegedly affect commerce adversely. The legal question involved here concerns the duty of the Commission to order the cancellation or lowering of rates to fulfill its statutory mandate. Section 18(b)(5) provides the basis for this analysis as well as the agency's authority to control detrimental rates.[57] In cases like this we need not rely on section 15, but only ensure that the commercial impact of the monopoly at the given level of pricefixing be assimilated and perceived by the Commission.[58] The exemption from usual antitrust standards is predicated on the Commission's doing just that. If it cannot—or will not—do this, the rationale of the antitrust exemption will cease. Hence, in this case, sensitivity to antitrust implications is incumbent upon this court, as it was upon the agency, though actual legal analysis of the particular problem posed may be accomplished adequately under section 18(b)(5).[59]

**53.** *But cf. Sabre Shipping Corp. v. American President Lines, LTD.*, 285 F.Supp. 949 (S.D. N.Y. 1968), *cert. denied sub nom. Japan Line, LTD. v. Sabre Shipping Corp.*, 407 F.2d 173 (2d Cir.), *cert. denied*, 395 U.S. 922, 89 S.Ct. 1774, 23 L.Ed.2d 239 (1969).

**54.** 46 U.S.C. § 813a (1976).

**55.** Pub. L. No. 87–346, 75 Stat. 762 (1961).

**56.** *FMC v. Svenska Amerika Linien,* 390 U.S. 238, 243, 88 S.Ct. 1005, 1008–09, 19 L.Ed.2d 1071 (1968).

**57.** *See American Export-Isbrandtsen Lines, Inc. v. FMC,* 417 F.2d 749 (D.C. Cir. 1969).

**58.** *Cf. Marine Space Enclosures, Inc. v. FMC,* 420 F.2d 577 (D.C. Cir. 1969) (FMC failure to hold hearings on restrictive shipping contracts was violation of § 15 as failure to guard the public interest); *Interpool Ltd. v. FMC,* No. 79–1194, slip op. at 18 (D.C. Cir. 18 Nov. 1980) ("Commission did not satisfy its responsibility to safeguard the public interest by deciding the case without determining how the rules would affect competition"). *See generally Volkswagenwerk Aktiengesellschaft v. FMC,* 390 U.S. 261, 273–74, 88 S.Ct. 929, 936, 937, 19 L.Ed.2d 1090, *modified,* 392 U.S. 901, 88 S.Ct. 2049, 20 L.Ed.2d 1361 (1968); *FMC v. Pacific Maritime Ass'n,* 435 U.S. 40, 53–54, 98 S.Ct. 927, 935–936, 55 L.Ed.2d 96 (1978); *FMC v.*

*Seatrain Lines, Inc.,* 411 U.S. 726, 739, 93 S.Ct. 1773, 1781–1782, 36 L.Ed.2d 620 (1973); *U.S. Lines, Inc. v. FMC,* 584 F.2d 543, 545–46 (D.C. Cir. 1978).

**59.** There is, of course, a danger that § 18(b)(5) could swallow up a sizable chunk of the antitrust freedom originating in § 15. The shipping conferences are, to be sure, primarily ratemaking organs. Still, there is no debate that § 18(b)(5) does qualify the liberty of ratemakers to set rates. Whether abusive of antitrust immunity or not, conferences are obliged to set *reasonable* and *non-detrimental* rates, or the Commission will be obligated to disapprove them. The purpose of § 18(b)(5) "is to provide the new Commission with authority to protect shippers against excessive rates established in dual-rate contracts or in conference tariffs on a noncontract basis." Index to Legislative History of the Steamship Conference/Dual Rate Law, 87th Cong., 2d Sess. (1962) (referring to the "1961 amendments") (Pub. L. No. 87–346, 75 Stat. 762 *et seq.*). Recognizing that § 15 could be too broadly pre-empted if § 18(b)(5) were not tempered, we would only have the Commission *disapprove* this particular rate structure proffered by the PWC. The ALJ's proposed remedy of mandating that wastepaper rates be "open," goes further than necessary at this time. The Commission must simply be prepared to monitor the conferences. Our problem here is not with the conference's

■ 1. *Wastepaper Competes with Wood-pulp and Woodchips.* The study of the ALJ Decision and the Commission Report in Part I above shows clearly that recyclable wastepaper operates in the same market alongside of woodpulp and woodchips. The Commission's decision, on the other hand, arbitrarily focused on the fact of some little improvement of wastepaper sales over time. But, "[s]uch evidence, while probative, was hardly conclusive on the question whether the rate structures were impeding development of *increased* recycling." [60] The Commission unjustifiably disregarded important pieces of highly informative evidence. First, the terrific growth in the level of woodchips exports was telling. Second, the testimony tending to prove that the relative price attractiveness and competitiveness of the nonwastepaper exports were encouraged by the disadvantageous freight component of the wastepaper delivery price was completely discounted by the Commission as hearsay. Moreover, the Commission overlooked and was not influenced by the unequivocal, potent, and oft-reaffirmed congressional expression of the public interest to encourage recycling.[61] This court has written that "[s]uch legislation, based on years of study of the problems of the recycling industry, evinces an evolving congressional plan to conserve resources and to promote recycling of depletable materials."[62] Plainly, the Commission's behavior in this case has enhanced not at all the prospects for recycling.

2. *Detriment to Commerce.* "[W]e believe that a party may show that a rate appears to be unreasonable by reference to a lower rate on a similar commodity which moves in a reciprocal or competitive trade."[63] This, said the Commission in an earlier investigation of shipping rate structures, was a proper application of section 18(b)(5). Detriment to commerce, interpreted the Commission, was not necessarily coextensive with specific "lost sales."[64] "Rather, we will define detriment as something harmful, not limit it to 'lost sales' *or other rigid formulas.*"[65] We thoroughly agree with this enunciation of principle, but find that the Commission has utterly failed to realize it here, as the foregoing discussion demonstrates.

Detriment to commerce has slipped past the Commission here just because of the rigid analytic framework it imposed on the rate structure under consideration. The Commission's inflexible focus on the fact of some noticeable quantitative increase in wastepaper exports, and viewing this as dispositive, was unduly rigid. The Commission, by its oversimplification, failed to resolve plain factual conflicts in the record,[66] and equally failed to satisfy its own prior understanding of section 18(b)(5).[67] This analysis was arbitrary and not supported by the record.

■ The Commission should have appreciated the logical relation of "unreasonable" rates and "detriment to commerce." These criteria are *dependent,* not independent as the Commission insisted. The logical rela-

---

ratemaking authority, but is only with the Commission's failure to evaluate the record acceptably in this case.

**60.** *NARI v. ICC,* 585 F.2d 522, 535 (D.C. Cir. 1978), *cert. denied,* 440 U.S. 929, 99 S.Ct. 1266, 59 L.Ed.2d 485 (1979) (footnote omitted) (emphasis in original).

**61.** *See id.* (discussing specifically § 204 of the Railroad Revitalization and Regulatory Reform Act of 1976, Pub. L. No. 94–210, 90 Stat. 40 (1976)).

**62.** *NARI v. ICC,* 585 F.2d 522, 531 n.45 (D.C. Cir. 1978), *cert. denied,* 440 U.S. 929, 99 S.Ct. 1266, 59 L.Ed.2d 485 (1979) (discussing NEPA, 42 U.S.C. § 4331 (1970); National Materials

Policy Act §§ 201–06, Pub. L. No. 91–512 (1970); Energy Supply and Environmental Coordination Act of 1974 § 8(a)(2), Pub. L. No. 93–319; Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.* (1976).

**63.** *Investigation of Ocean Structures,* 12 F.M.C. 34, 58 (1968).

**64.** *Id.* at 61.

**65.** *Id.* (emphasis added).

**66.** *See* note 46 *supra* and accompanying text.

**67.** *See* notes 63–64 *supra* and accompanying text.

tion of dependency does not entail that *all* unreasonable rates would be detrimental to commerce within the dualistic statutory guideline,[68] but only that the one raises an implication of the other. A showing of either criterion would suggest that further study of the other were warranted. Of course, this is especially true under the conditions presented here—a time of undeniable expansion of the relevant market. Essentially, detriment to commerce must be viewed through the gauge of reasonableness for a period when generalized demand waxes strong for the competing materials, including wastepaper. It was simply not enough for the Commission to note that sales of wastepaper had increased, thereby disproving detriment to commerce.

The Commission's error is thus two-fold. First, it did not seriously rely on the whole record to reach its decision; a decision which, hence, cannot and does not rest on substantial evidence. Second, the Commission's methodology has been severely incomplete and arbitrary, its reasoning demonstrably flawed; its rationale does not take us from point A to point X, because it ignores point A to start with, as well as a few stations along the way; compared to that of the ALJ, the Commission's reasoning is totally unconvincing.

## C. Remaining Issues

1. *National Environmental Policy Act of 1969 (NEPA).*[69] Section 102 of NEPA requires that a federal agency prepare a detailed environmental impact statement for a "major Federal action[ ] significantly affecting the quality of the human environment."[70] Here, the agency did prepare an environmental impact statement. The theory inspiring the statement was that the lower shipping rates for wastepaper would

generate greater demand for that product in the Far East so, therefore, the "environmentally preferable alternative" was to declare PWC's wastepaper rates unlawful.[71] "This choice," the Commission's Office of Environmental Analysis concluded, "appears to be the one most likely to enhance the environmental quality and the United States' ability to maximize the use of this important recyclable...."[72]

The Office of Environmental Analysis based its environmental recommendation on certain economic assumptions, namely, that lower rates would increase wastepaper exports, and that wastepaper is adequately competitive and interchangeable with woodpulp and woodchips in the Japanese papermaking industry.[73] . These assumptions were tried by the ALJ and confirmed by him, but rejected by the Commission. Hence, the Commission declined, of course, to adopt the alternative proposed in the environmental impact statement, ruling that the underlying economic assumptions were invalid so that the projected environmental benefits were illusory.[74] This court, however, is persuaded that the ALJ was right and the Commission wrong. Therefore, we can recognize the merit of the environmental contentions made in the environmental impact statement. Our same analysis requiring us to reverse the Commission on section 18(b)(5) of the Shipping Act applies to the Commission's rejection of the conclusions presented in the environmental impact statement prepared for this case. The consistency of those environmental conclusions with the ALJ's economic findings suggests to us that the environmental impact statement is valid. Our decision to reject the Commission's decision as to the Shipping Act, along with our instruc-

**68.** "The Commission shall disapprove any rate ... it finds to be *so unreasonably high ... as to be detrimental* to the commerce of the United States." 46 U.S.C. § 817(b)(5) (1976) (§ 18(b)(5) of the Act) (emphasis added).

**69.** 42 U.S.C. §§ 4321 *et seq.* (1976).

**70.** *Id.* § 4332.

**71.** *See* Final Environmental Impact Statement, prepared by the FMC's Office of Environmental Analysis at 28, *reprinted in* J.A. at 267.

**72.** *Id.*

**73.** *Id.* at 5, *reprinted in* J.A. at 244.

**74.** Report at 21–22 n.36, *reprinted in* J.A. 228–29 n.36.

tion that in the future the Commission consider reasonableness of shipping rates *and* detrimental commercial effects, realizes the substance of the environmental proposals. Thus, we are assured of compliance with NEPA as an environmental impact statement was in fact compiled, and, as our order requires that approval of these rates, based on this record, be vacated. We need not say more on the NEPA issue at this time.[75]

2. *Other Shipping Act Issues.* Petitioners sought to question the wastepaper rates fixed by the PWC under sections 16 First and 17 of the Act.[76] The ALJ made no findings with respect to these two statutory sections which proscribe unreasonably preferential and unjustly discriminatory rates, stating that "[i]n view of the foregoing disposition, no useful regulatory purpose would be served by determining the sections 16 First and 17 issues in this proceeding." [77] The Commission, however, discussed these sections in its decision to reverse the ALJ and hold against the petitioners on all issues. As we affirm the ALJ and hold in favor of petitioners, it is unnecessary for us to reach the section 16 First or section 17 issues.

### III. CONCLUSION

Finding that the Commission has failed to provide a reasoned decision based on substantial evidence that supports its position reversing the ALJ, we order that approval of these particular wastepaper rates be vacated under section 18(b)(5) of the Shipping Act. We hold only that these rates may not be approved on the basis of the existing administrative record. The Commission may in the future undertake section 18(b)(5) review of any such rate structures in full consideration of both the *reasonableness* of the conference-fixed rates and the *detriment to commerce* latent in those rates. The Commission is free to engage in

any further administrative proceedings in this case not inconsistent with this opinion.

*So ordered.*

MIKVA, Circuit Judge, dissenting:

Judge Wilkey's analysis of the economics of wastepaper shipment across the Pacific is quite plausible, and if we were sitting as Federal Maritime Commissioners I might well concur. But as a judge applying the substantial evidence test to a decision of a presumptively expert agency, I believe the record requires us to uphold the Commission's determination. The disagreement between the Commission and its Administrative Law Judge does not entitle us to substitute our own views on cross-elasticity and market trends.

The evidence is not so unequivocal as the majority claims. For example, the alleged unreasonableness of wastepaper rates was to be shown by comparison with woodpulp rates, and petitioners offered evidence that their customers would "shift to woodpulp unless [the Pacific Westbound Conference] reduced its freight rates for wastepaper." Majority opinion at 825 n.46. Yet the record demonstrates that the great success of woodchips was not shared by woodpulp, and that Conference members experienced a *decline* in woodpulp exports. *Id.* at 819 n.9. This evidence would support some skepticism about the theory that the boom in woodchips must inevitably extend to wastepaper if the rates were lowered.

I am also somewhat perplexed by the majority's reliance on *NARI v. ICC*, 585 F.2d 522 (D.C.Cir.1978), *cert. denied*, 440 U.S. 929, 99 S.Ct. 1266, 59 L.Ed.2d 485 (1979), as support for a congressional mandate to the Federal Maritime Commission to encourage recycling. That decision was based on section 204 of the Railroad Revitalization and Regulatory Reform Act of 1976, Pub. L. No. 94–210, 90 Stat. 40 (1976) (codified at 45 U.S.C. § 793 note (1976)),

---

**75.** The ALJ did not consider environmental evidence in reaching his decision. The Commission instructed him to limit his investigation to the economic record. *See* I.D. at 31, *reprinted in* J.A. at 34.

**76.** 46 U.S.C. §§ 815 First, 816 (1976).

**77.** I.D. at 99, *reprinted in* J.A. at 131.

which is directed specifically at the Interstate Commerce Commission. *See NARI v. ICC,* 627 F.2d 1328, 1331–1332, 1338–1339 (D.C.Cir.1980) (argued the same day as the case at bar). Though the legislative history may demonstrate some initial interest in applying a similar rule to the Federal Maritime Commission, that interest was not expressed in the statute as enacted, and even a provision requiring the Federal Maritime Commission to participate in a research program was dropped in conference. *See* S.Rep.No.595, 94th Cong., 2d Sess. 150–51 (1976). Surely this limits the force of Interstate Commerce Commission precedents.

In short, while the Federal Maritime Commission may have been mistaken, I believe that it committed no error of law, and that substantial evidence in the record as a whole supports its findings. I respectfully dissent.