646 F.2d 1187
 BOARD OF TRADE OF the CITY OF CHICAGO, Petitioner,
v.
The INTERSTATE COMMERCE COMMISSION et al., Respondents,
Baltimore & Ohio Railroad Company et al., Intervening Respondents.
The PEAVEY COMPANY et al., Petitioners,
v.
The INTERSTATE COMMERCE COMMISSION et al., Respondents,
Baltimore & Ohio Railroad Company et al., Intervening Respondents.
 Nos. 80-1309, 80-1470.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 2, 1980.
Decided April 16, 1981.
Rehearing Denied May 21, 1981.
 
 Harold E. Spencer, Chicago, Ill., Ross L. Thorfinnson, Hopkins, Minn., for petitioner.
 Tim L. Abendroth, Interstate Commerce Commission, Washington, D. C., for respondent.
 John A. Daily, Philadelphia, Pa., for intervening respondents.
 Before PELL and BAUER, Circuit Judges, and WILL, Senior Judge.*
 WILL, Senior Judge.
 
 
 1
 Petitioners appeal from a decision of the Interstate Commerce Commission that certain tariff schedules filed by the intervening respondent railroads are not unlawful under the Interstate Commerce Act. For the reasons hereinafter stated, we reverse and remand.I
 
 
 2
 Prior to 1976, rates from Chicago[1] to eastern destinations for wheat and wheat products which arrived in Chicago by rail, lake vessel, or barge were lower than rates from Chicago to eastern destinations for wheat and wheat products which arrived in Chicago by for-hire motor carrier. This difference resulted from the railroads' practice of charging ex-rail wheat the proportional rate east of Chicago while charging ex-motor carrier wheat the flat rate east of Chicago. A flat rate is a local rate of one or more carriers. A proportional rate is a portion of the through rate based on a percentage and/or differential over or under the Chicago to New York rate. Proportional rates are generally lower than flat rates between the same points.
 
 
 3
 In 1976, in its case No. 35825, the Interstate Commerce Commission held that this practice illegally discriminated against ex-motor carrier traffic in violation of the Interstate Commerce Act. The Court of Appeals for the Eighth Circuit affirmed that ruling in Atchison Topeka & Santa Fe Railway Co. v. United States, 549 F.2d 1186 (8th Cir.), cert. denied, 434 U.S. 874, 98 S.Ct. 223, 54 L.Ed.2d 154 (1977).
 
 
 4
 To comply with the ICC order that they cease their discriminatory application of rates, the railroads proposed a plan Plan A which, if it had become effective, would have cancelled all proportional rates out of Chicago. The flat rates would have been applied whether the traffic was ex-motor carrier or ex-rail. The rates proposed by Plan A were suspended while the ICC conducted its investigation, docketed on the suspension and investigation docket as No. 9194.
 
 
 5
 Before the ICC reached a decision on Plan A, however, the railroads asked for and received permission to cancel the suspended Plan A tariffs and to file a second plan, Plan B. Under Plan B, proportional rates would be applied to ex-rail and ex-motor carrier traffic for nontransit movements east of Chicago. Flat rates would be applied on shipments being transited east of Chicago. "Nontransit shipments are transported in a continuous movement from origin to destination, usually over direct service routes." Transit on Wheat Between Reshipping Point and Destination, 362 I.C.C. 529, 556 (1980). Transit shipments are interrupted at least once for storage or processing. The term transit applies both to the interruption and to the transit privilege which permits a shipper to mill or store the shipment at a designated point and continue to use the through rate to the final destination. A separate transit fee rather than a higher rate was charged for transit shipments. Under Plan B, the transit privilege would be available only if the shipper chose to be charged the flat rate; if the shipper was charged the proportional rate from Chicago to the transit destination, he would be charged the flat rate upon reshipment from the intermediate point. Plan B did not discriminate against ex-motor carrier traffic. The railroads claimed that the cancellation of transit on proportional rates was necessary because transit shipments under the previous tariff schedules were not producing adequate revenue.
 
 
 6
 The railroads also asked the Commission for relief from its outstanding order in Southwestern Millers' League v. Atchison, Topeka and Santa Fe Railway, 227 I.C.C. 794 (1938), and from section 10726 of the Interstate Commerce Act. Southwestern Millers' had established different outbound rates from Chicago depending on where the shipment had originated. Section 17026 prohibits carriers from charging more for a shorter distance than for a longer distance over the same route in the same direction, 49 U.S.C. § 10726(a)(1)(A), or more under a through rate than under the total of the intermediate rates. 49 U.S.C. § 10726(a)(1)(B).
 
 
 7
 The petitioners argued before the Commission that the revenue difficulties of the railroads could be solved by charging a higher transit fee, and that Plan B violated sections 10741(a) and (b) of the Interstate Commerce Act by preferring transit users west of Chicago and prejudicing transit users east of Chicago who would be charged the higher flat rates because of where they took transit. The petitioners also argued that the railroads had violated section 10706(a)(2)(A) of the Interstate Commerce Act by failing to follow the docketing procedures established in the Agreement of the Eastern Railroads Under Section 5b of the Interstate Commerce Act. The ICC rejected the petitioners' arguments, held that Plan B complied with their order in the ex-motor carrier case, and that the rates were lawful and not illegally discriminatory, and granted respondents the relief requested.
 
 
 8
 In this appeal, petitioners raise four issues: whether the ICC erred in finding that the tariff schedules in Plan B did not violate the notice procedures set forth in the Agreement of the Eastern Railroads Under Section 5b of the Interstate Commerce Act; whether the ICC erred in finding that the tariff schedules in Plan B did not violate 49 U.S.C. §§ 10704, 10741(a), and 10741(b); whether the ICC erred in ruling that the tariff schedules did not violate the merger conditions imposed on Conrail, the Chessie System, Norfolk & Western, and Burlington Northern; and whether the ICC erred in denying the motion of petitioners to compel answers to interrogatories about the railroads' revenue. Because we hold that the railroads violated 49 U.S.C. § 10706(a)(2) (A) by failing to follow the rate-setting procedures established in the Agreement of the Eastern Railroads Under Section 5b of the Interstate Commerce Act, we need not decide the other issues.
 
 II
 
 9
 The intervening respondent railroads are parties to the Agreement of the Eastern Railroads Under Section 5b of the Interstate Commerce Act, an agreement which the ICC has approved. See Eastern Railroads Agreements, 277 I.C.C. 279 (1950).[2] The Agreement specifies procedures for the "joint consideration, initiation, or establishment" of rates. If the railroads comply with these procedures, they can agree on joint rates and what otherwise might be a conspiracy to set prices in violation of the antitrust laws is not actionable. 49 U.S.C. § 10706(a)(2)(A) (formerly section 5b of the Interstate Commerce Act).
 
 
 10
 The rate-setting process occurs in several committees created by the Agreement and composed of representatives of the member railroads. Initially, a proposal is submitted to the relevant committee defined by the subject matter of the proposal and the territory which would be affected by it[3] in writing and signed by the proponent, who can be any interested party and need not be a member. Article III, § 2. Then,
 
 
 11
 (t)he Chairman of an organization to which a proposal is properly presented will give public notice of the proposal by publication of a synopsis thereof in the next available Traffic World or other recognized traffic publication, stating that interested parties, within 14 days after such publication, may communicate their views regarding it to the Chairman.
 
 
 12
 Article III, § 3(a). A proposal may be decided by a mail vote, Article III, § 5, but if it is not disposed of by mail, or if a shipper requests a hearing, the proposal is placed on "the docket of the organization for consideration and determination at its next meeting." Article III, § 6.
 
 
 13
 Shippers and others interested in any proposal , upon request to the Chairman of the committee before which it is pending, will be accorded reasonable opportunity to appear before the committee to present facts and other considerations material and relevant to the proposal. In lieu of such appearance any such interested person may submit a written statement of such facts and considerations, which will be distributed by the Chairman to the committee members. A rehearing may be accorded, in like manner, by the same committee to hear new matter not previously presented.
 
 
 14
 Article III, § 8. Each member of the organization has one vote. Article III, § 9. Only organization members can request review of the decision. Article III, § 10. When requested, review is by the Traffic Executive Association of the Eastern Railroads. If review is not requested, the chairman gives notice of the outcome to the organization members, a tariff publishing agent (if appropriate), and in Traffic World, or any other recognized traffic publication. Article III, § 10. The rate is then filed with the ICC and is subject to the notice and other procedural and substantive requirements of the Interstate Commerce Act. 277 I.C.C. at 288. See 49 CFR §§ 1300.00 et seq. At any time before or after the determination by the railroads, each railroad "is accorded the free and unrestrained right to take independent action, without fear of any sanction or retaliatory action ," Article III, § 12(a), an independence required by statute. 49 U.S.C. § 10706(c)(2)(C).
 
 III
 
 15
 In this case, the railroads did not follow the prescribed 5b procedures before submitting Plan B to the ICC. In the proceedings before the Commission, the railroads argued that they did not have to follow the procedures because the tariff changes at issue fell within two exceptions to the requirement that notice and an opportunity to be heard be given. They invoked the exception for proposals of an emergency character "such that 'the customary procedure cannot be followed,' " and the exception for "changes in rates or charges growing out of decisions of and orders by the Interstate Commerce Commission " (exception 8).
 
 
 16
 The ICC held that neither of these exceptions exempted the tariff changes proposed in Plan B from the 5b requirements. The Commission reasoned that the railroads could not claim in February 1979, when they proposed Plan B, that the existence of the January 1976 order in the ex-motor carrier case created an emergency. In rejecting the argument that exception 8 applied, the ICC said, "(w)e do not believe that the railroads' decision to eliminate transit can be said to 'grow out of' the railroads' forced elimination of discrimination against trucks." Transit on Wheat Between Reshipping Point and Destination, 362 I.C.C. 529, 562 (1980).
 
 
 17
 Although it held that the railroads should have followed the 5b procedures before filing Plan B with the Commission, the ICC excused the railroads' failure to comply with the Agreement. It based its lenience on the vagueness of the phrase "growing out of" in exception 8, apparently considering the railroads' reliance on that language to be reasonable although incorrect. The ICC also held that the railroads' petition regarding Plan B, which they had filed in the ICC investigation of Plan A, was constructive notice to the shippers of Plan B, and that constructive notice was sufficient. 362 I.C.C. at 562-63.
 
 IV
 
 18
 The ICC erred in overlooking the nonfeasance of the railroads. As the Commission itself noted, the exceptions in the Agreement are to be narrowly construed. Although the ICC did not construe exception 8 broadly, it allowed the railroads to rely on an overbroad construction, and the result avoidance of the Agreement's requirements was the same. The suggestion that the ICC will ignore failure to comply with the Agreement if the railroads can advance a reasonable construction of an exception to justify that failure is improper and invites abuse.
 
 
 19
 The notion of constructive notice is also inappropriate in this context.
 
 
 20
 From the earliest days of the enactment of section (5b), it has been axiomatic that the relief from the antitrust laws provided by (5b) obtains only where the approved agreement is carried out strictly in conformity with its provisions and within the terms and conditions prescribed by this Commission.
 
 
 21
 Rate Bureau Investigation, 349 I.C.C. 811, 824 (1975). Allowing the railroads to give only constructive notice, or any notice other than that prescribed by the Agreement, violates that principle.
 
 
 22
 Furthermore, the railroads' failure to follow the 5b procedures not only resulted in a lack of notice to shippers but denied shippers an opportunity to have a hearing on the proposal prior to its submission to the ICC. That denial violates the Interstate Commerce Act: "(f)air administration of section (5b) of the act requires that all interested parties be afforded adequate opportunity to express their views regarding proposals prior to a final determination (by the railroad organization)." Household Goods Carriers' Bureau Agreement, 329 I.C.C. 258, 262 (1966).
 
 
 23
 The importance of the notice and hearing procedure established by the Agreement the conference procedure to the carriers, the shippers, and the national transportation policy has been explained by the ICC.
 
 
 24
 The conference procedure enables shippers to present their views upon a proposal at one time and place in lieu of multiple presentations at the expense of much time and effort before numerous carriers; assures a full consideration of the views of opposing shippers, and affords protection to small shippers and the smaller carriers that would not obtain in the absence of the conference method. This procedure permits consideration of all the facts and circumstances as to the lawfulness of the proposed changes, and concurrent action by all competing and connecting carriers. In this way the procedure avoids the injurious effects upon a particular railroad, and the shippers it serves, of sudden and unannounced action by a competing line or lines.
 
 
 25
 The public docketing and notice of proposed changes in rates, and the subsequent hearing and consideration thereof before the members of the committee frequently result in composition of differences between shippers, or withdrawal, rejection, or modification of the proposal, and in general results in rates more satisfactory to shippers and carriers than otherwise would be possible In those instances where rates satisfactory to the interested shippers and carriers can be evolved by conference procedure, the expense of litigation before this Commission is avoided. The advance notice of rate changes which this procedure provides is of advantage to all interested parties in that by alerting them to prospective changes, it in effect affords them a longer time in which to marshall and present their protest against the change and to request its suspension and investigation under the pertinent provisions of the act.
 
 
 26
 Eastern Railroads Agreements, 277 I.C.C. at 282-83, 284-85. "Only in this way can adjustments of rates to changing conditions and the needs of carriers and shippers be considered with the degree of promptness, the intimate knowledge of conditions, and the opportunity for useful compromises, that are needed to promote the commerce of the country." Western Traffic Association Agreement, 276 I.C.C. 183, 213 (1949). The "opportunity for useful compromises" provided by the procedures refutes the ICC's claim in this case that "bureau docketing procedures have no effect on substantive rate changes." 362 I.C.C. at 563.
 
 V
 
 27
 The intervening respondent railroads incorrectly argue that "antitrust issues are not for the Commission." Although the ICC does not have the power to find that the railroads have violated the antitrust laws, insofar as antitrust policies are embodied in the Interstate Commerce Act, the ICC has a duty to consider the competitive effects of carrier action.
 
 
 28
 Section 5b represents a congressional "accommodation of the differing policies embodied in the antitrust laws and in the Interstate Commerce Act, particularly in furtherance of the national transportation policy." Eastern Railroads Agreements, 277 I.C.C. at 280. The national transportation policy condemns cutthroat competition among carriers; joint action by the railroads on rates, and antitrust immunity for such action, is therefore necessary. Western Traffic Association Agreement, 276 I.C.C. at 188. To diminish the possibility of harm to shippers inherent in that plan, however, the Agreement, sanctioned by section 5b, provides for the orderly consideration of rates and an opportunity for the affected shippers to be heard as a prerequisite to antitrust immunity. In this case, the ICC, by condoning the railroads' circumvention of the Agreement, upset the congressional balance.
 
 
 29
 Monitoring by the ICC of the observance of the Agreement is essential to the enforcement of section 5b. If the procedures are not followed but the ICC nevertheless approves the rate, although section 5b does not render the rate immune from the antitrust laws because the Agreement has not been carried out, the ICC approval itself shelters the joint rates from private suit under the antitrust laws. If the Commission has found that the rates are reasonable and nondiscriminatory, a private shipper cannot recover under the antitrust laws for damages caused by loss of the benefit of rates still lower which but for the conspiracy he would have enjoyed. Keogh v. Chicago & Northwestern Railway Co., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). In other words, even if the conference procedures, which Congress considered necessary to justify immunity from the antitrust laws, are not followed, antitrust immunity inures if the ICC fails to correct that noncompliance but approves the rate. Therefore, to prevent frustration of the congressional purpose, unless the ICC finds that the 5b procedures were followed or were not applicable because of an exception to the Agreement, the ICC must find that the tariff schedule is unlawful and in violation of 49 U.S.C. § 10706(a)(2)(A). Because the Commission failed to do so in this case, we reverse the determination of the ICC and remand for further proceedings consistent herewith.
 
 
 
 *
 Hon. Hubert L. Will, Senior Judge of the Northern District of Illinois, is sitting by designation
 
 
 [1]
 Rate plans also apply to shipments moving eastward from gateways other than Chicago
 
 
 [2]
 The ICC approves an agreement by a class of carriers if it "finds that the making and carrying out of the agreement will further the transportation policy ;" if the agreement is limited to matters relating to transportation under joint rates or over through routes; if the agreement concerns "rates, fares, classifications, division, allowances or charges ;" and if each party is given the right to take independent action. 49 U.S.C. § 10706(a)(2) (A). See also Eastern Railroads Agreements, 277 I.C.C. 279, 280 (1950)
 
 
 [3]
 The General Freight Traffic Committee considers matters of interest to eastern carriers generally; three subterritorial freight traffic committees consider matters local to the three subterritories (central, trunk, and New England). There are two coal, coke, and iron ore committees, one for the trunk-line territory and the other for the central territory. The agreement also creates an Official Classification Committee, a National Perishable Freight Committee, a National Diversion and Reconsignment Committee, and a National Container Committee in conjunction with railroads in western and southern territories, and a passenger department consisting of one committee for trunk-line central territories and one for New England. Matters considered by these committees may be reviewed by the President's Traffic Conference or the Traffic Executive Association, both of which have initial powers as well. Traffic matters usually are determined without going beyond the Traffic Executive Association as the President's Traffic Conference "deals with matters of exceptional importance, only, and rarely convenes." 277 I.C.C. at 281