NATIONAL ASSOCIATION OF RECY-
CLING INDUSTRIES, INC., et al.,
Plaintiffs-Appellants,

v.

AMERICAN MAIL LINE, LTD., et al.,
Defendants-Appellees.

No. 83–5551.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 9, 1983.

Decided Nov. 14, 1983.

Certiorari Denied March 19, 1984.
See 104 S.Ct. 1616.

Edward L. Merrigan, Washington, D.C.,
for plaintiffs-appellants.

James Murray, Graham & James, San
Francisco, Cal., John P. Meade, Hill, Betts
& Nash, Robert Nicholson, Dept. of Justice,
Washington, D.C., Thomas E. Kimball, Lil-
lick, McHose & Charles, San Francisco, Cal.,
for defendants-appellees.

* Honorable Walter E. Hoffman, Senior United
States District Judge, Eastern District of Vir-

Before SCHROEDER and CANBY, Cir-
cuit Judges, and HOFFMAN,* District
Judge.

SCHROEDER, Circuit Judge.

This appeal from the dismissal of an anti-
trust action requires this court to interpret
the antitrust exemption contained in section
15 of the Shipping Act of 1916, 46 U.S.C.
§ 814 (1976). Section 15 immunizes from
the antitrust laws conferences of common
carriers that engage in collective rate-mak-
ing, provided that the rate-making is autho-
rized by agreements which the Federal
Maritime Commission (FMC) has approved
and provided further that all rates have
been properly filed with the FMC. Al-
though individual rates require no separate
FMC approval to take effect, under
§ 18(b)(5) of the Shipping Act, the FMC
can later disapprove rates that it finds so
unreasonably high or low that they are
detrimental to United States commerce. 46
U.S.C. § 817(b)(5) (1976). The principal is-
sue in this case is whether shipping rates
that the FMC has not disapproved have
antitrust immunity if, as plaintiffs allege,
they violate § 18(b)(5).

This action was brought by the National
Association of Recycling Industries, Inc.
(NARI), a trade association of wastepaper
exporters to the Far East, and three of its
member firms, against a group of common
carriers who are present or former mem-
bers of the Pacific Westbound Conference
(PWC). The PWC is a rate-setting organi-
zation acting under an FMC-approved
agreement. NARI claims that the PWC's
rates for shipping wastepaper, which were
otherwise authorized by the conference
agreement and properly filed with the
FMC, are unreasonably high and discrimi-
nate against NARI's members. They argue
that the rates violate the antitrust laws by

ginia, sitting by designation.

preventing wastepaper exporters from competing with exporters of woodpulp and woodchips, rival products in the paper manufacturing process. The district court dismissed the case on the basis of the antitrust immunity granted by section 15 and rejected NARI's contention that section 15 immunity should not apply if the rates are unreasonably high. We affirm.

NARI's antitrust claim has emerged from eleven years of administrative and judicial proceedings involving the PWC's wastepaper rates. In 1972, the FMC began an investigation of possible violations of sections 15, 16 First, 17 and 18(b)(5) of the Shipping Act. 46 U.S.C. §§ 814, 815, 816, and 817(b)(5) (1976). In 1977, the Administrative Law Judge held that the rates violated sections 15 and 18(b)(5), but in March 1979, the FMC reversed the ALJ's decision and found the wastepaper rates to be lawful.

On NARI's petition for review, the District of Columbia Circuit vacated the FMC's approval of the wastepaper rates. *National Association of Recycling, Industries, Inc. v. FMC,* 658 F.2d 816 (D.C.Cir.1980). There the court stated that it "appear[ed] inescapable" that the rates violated section 18(b)(5) of the Shipping Act. *Id.* at 825. Rather than affirming the ALJ's statements concerning antitrust immunity, however, the court ruled only that the FMC could not approve the rates based on the existing administrative record. *Id.* at 829. Although the FMC has held its docket open for final determination of the rates' legality, all litigation has since shifted to this antitrust action.

NARI now seeks treble antitrust damages for the entire period since proceedings began in 1972, arguing that because of the District of Columbia Circuit's indication that the PWC's wastepaper rates violated section 18(b)(5), the rates have never been lawful and therefore do not qualify for section 15 immunity. Section 15 states:

> Every agreement, modification, or cancellation lawful under this section, or permitted under section 813a of this title, shall be excepted from the provisions of sections 1 to 11 and 15 of Title 15, and amendments and Acts supplementary thereto.

The exemption granted by section 15 has been extended to include "activities conducted pursuant to approved agreements" as well. *Yellow Forwarding Co. v. Atlantic Container Line,* 668 F.2d 350, 352 (8th Cir. 1981), *cert. denied,* 456 U.S. 962, 102 S.Ct. 2039, 72 L.Ed.2d 486 (1982).

As so construed, the statute reveals a major textual flaw in plaintiffs' position. While NARI argues that the antitrust immunity does not apply because the rates are unlawful under section 18, the immunity contained in section 15 extends to activities lawful "under this section," that is, section 15. As long as the FMC has not disapproved the rates they are lawful under section 15, and appear to be entitled to immunity under the language of the statute.

Furthermore, Supreme Court case authority does not support NARI's interpretation of section 15. In contending that a rate which may be described as "unlawful" under section 18(b)(5) is outside the scope of section 15 immunity, NARI relies upon language in *Carnation Co. v. Pacific Westbound Conference,* 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966), that "unlawful rate-making activities are not exempt." *Id.* at 217, 86 S.Ct. at 784. The holding in *Carnation Co.,* however, is limited to agreements which the FMC has not approved. *Id.* at 216, 86 S.Ct. at 783. In later cases, the Supreme Court has indicated that the approval process itself shields conference agreements from the antitrust laws. *See FMC v. Seatrain Lines, Inc.,* 411 U.S. 726, 728, 93 S.Ct. 1773, 1776, 36 L.Ed.2d 620 (1973); *Volkswagenwerk Aktiengesellschaft v. FMC,* 390 U.S. 261, 271, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968).

Other courts and the FMC have construed section 15 to mean that activities authorized by approved agreements receive antitrust immunity even if they violate other Shipping Act provisions or other statutes. *See Yellow Forwarding Co. v. Atlantic Container Line,* 498 F.Supp. 105 (E.D.Mo.1980), *aff'd,* 668 F.2d 350 (8th Cir.1981), *cert. de-*

*nied,* 456 U.S. 962, 102 S.Ct. 2039, 72 L.Ed.2d 486 (1982); *Baton Rouge Marine Contractors, Inc. v. Cargill, Inc.,* 1976–2 Trade Cas. (CCH) ¶ 61,212 (E.D.La.1976). *See also Dreisbach v. Murphy,* 658 F.2d 720 (9th Cir.1981). The same principle can be applied from the other direction as well; a rate which is set under an agreement that the FMC has not approved does not enjoy antitrust immunity. *See Carnation Co. v. Pacific Westbound Conference,* 383 U.S. at 217, 86 S.Ct. at 784. Moreover, carriers acting under approved agreements lose their antitrust immunity if they continue to charge rates that the FMC has disapproved. 46 U.S.C. § 814 (1976).

Plaintiffs in this case, however, seek to impose retroactive antitrust liability for allegedly unreasonably high rates which have been set pursuant to an approved agreement and which have not yet been disapproved by the FMC. That result in our view would be fundamentally contrary to the Congressional intent behind the Shipping Act's regulatory scheme. The possibility of such potential retroactive liability for rates later declared unlawful would place carriers in a position of great uncertainty and would force them to seek formal FMC approval in connection with every rate change. Yet the language of section 15 clearly indicates that Congress intended to give carriers the latitude to enact new rates, without separate approval, to meet quickly changing market conditions. *See Interpool Ltd. v. FMC,* 663 F.2d 142, 147–48 (D.C.Cir.1980).

The only case in accord with NARI's reading of section 15 is *Sabre Shipping Corp. v. American President Lines, Ltd.,* 285 F.Supp. 949 (S.D.N.Y.1968), *cert. denied sub nom. Japan Line, Ltd. v. Sabre Shipping Corp.,* 407 F.2d 173 (2d Cir.), *cert. denied,* 395 U.S. 922, 89 S.Ct. 1774, 23 L.Ed.2d 239 (1969). *Sabre's* holding that section 15 im-

munity can be lost if shipping rates violate section 18(b)(5) has never been followed, and we agree with the district court that it is unpersuasive authority for imposing antitrust liability here.[1]

Plaintiffs' efforts to find support in cases involving section 5a of the Interstate Commerce Act, 49 U.S.C. § 10706 (Supp. V 1981) are also unavailing. The Commerce Act analogy is of limited usefulness to a Shipping Act case since the statutes contain different criteria for approval of collective rate-making, and their legislative histories reflect different concerns. As Professor Sullivan has noted:

> It is important to recognize that there is no single conception which defines the scope of the exemption for a regulated industry. Although one can draw on case law from one industry for guidance as to outcome in another, there are, in a sense, as many sets of exemption doctrines as there are industries subject to state or federal regulation. In each industry the process of accommodating regulatory doctrine to antitrust doctrine is responsive to particulars such as those here referred to and, in some degree no doubt, to the degree of confidence which the court has and the quality of the regulatory performance by the particular regulatory agency.

L. Sullivan, *Handbook of the Law of Antitrust* § 239 at 743–44 (1977), *quoted in Northrop Corp. v. McDonnell Douglas Corp.,* 705 F.2d 1030, 1056 n. 34 (9th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 156, 78 L.Ed.2d 144 (1983). However, even under the Commerce Act, courts grant antitrust immunity to rates established pursuant to ICC-approved agreements and in accordance with agency procedures. *See Board of Trade of City of Chicago v. ICC,* 646 F.2d 1187 (7th Cir.1981).

---

**1.** *Sabre* was never the subject of appellate review on the merits. After the district court decided the immunity question, it denied the defendants' motion to stay the action pending FMC examination of the rates in question. The defendants filed an extraordinary petition for a writ of certiorari challenging the denial of the stay and the Second Circuit ruled only on the appropriateness of the petition. *Japan Line, Ltd. v. Sabre Shipping Corp.,* 407 F.2d 173, 174 (2d Cir.1969). The case subsequently settled without trial. *See Sabre Shipping Corp. v. American President Lines, Ltd.,* 298 F.Supp. 1339 (S.D.N.Y.1969).

NARI places particular reliance upon the District of Columbia Circuit's recent decision in *United States v. Bessemer Lake Erie Railroad Co.,* 717 F.2d 593 (D.C.Cir.1983). In *Bessemer,* defendants already had pleaded *nolo contendere* to criminal antitrust charges, and the court held that they could not invoke the civil antitrust immunity conferred by section 5a. Although *Bessemer* contains broad language criticizing abuse of immunized activities, the case does not support ignoring the express antitrust immunity granted under section 15 of the Shipping Act, because *Bessemer* involved both criminal charges and agreements wholly outside the scope of ICC-sanctioned rate-making.

NARI argues in the alternative that section 15 immunity does not apply because the wastepaper rates constitute conference activity outside the scope of the approved agreement. NARI reasons that since Article 2 of the PWC's conference agreement contains an anti-discrimination clause closely resembling sections of the Shipping Act[2] and since the PWC's shipping rates allegedly discriminate against wastepaper exporters, the rates are outside the scope of the agreement and therefore not entitled to immunity.

We agree with the district court's conclusion that if liability does not exist by virtue of the Shipping Act, it should not exist for a violation of similar provisions contained in the conference agreement. As the district court observed:

> [i]t would be anomalous to hold that defendants are exempt from application of the antitrust laws even if violation of the Shipping Act could be established, and then to hold that defendants were so liable for writing into their agreement provisions of the Shipping Act that they were bound by anyway.

*National Association of Recycling Industries, Inc. v. American Mail Line, Ltd.,* No. CV 82–895–LTL, slip op. at 16 (C.D.Cal. Dec. 3, 1982).

Our own decisions support the conclusion of the district court that so long as the activity in question, in this case rate-making, is authorized by the FMC-approved agreement, the defendants cannot be said to have acted outside the scope of the agreement. *Dreisbach v. Murphy,* 658 F.2d 720 (9th Cir.1981); *American Export & Isbrandtsen Lines v. FMC,* 334 F.2d 185 (9th Cir.1964). *See also Pacific Westbound Conference v. FMC,* 440 F.2d 1303 (5th Cir.), *cert. denied,* 404 U.S. 881, 92 S.Ct. 202, 30 L.Ed.2d 162 (1971).

NARI argues that, absent antitrust liability, it is left without any effective remedy. Private remedies do exist under the Shipping Act, however. These include: reparations as far back as two years prior to the proceedings' commencement for violations of sections 16 and 17, 46 U.S.C. § 821 (1976); prospective rate relief for violations of section 18(b)(5), 46 U.S.C. §§ 814, 822 (1976); and injunctive relief if an FMC order is disobeyed. 46 U.S.C. § 828 (1976). The FMC also may impose civil and criminal penalties up to $5,000 per day. 46 U.S.C. §§ 815, 817(b)(6), 831 (1976). The path to more effective remedies begins in Congress, not the courts.

Plaintiffs' final attempt to salvage this action rests upon certain contracts that some of the defendants made with other carriers for the shipment of woodchips. Plaintiffs stress that these contracts, which provide for lower rates than the ones which plaintiffs must pay for shipping their wastepaper, demonstrate that the wastepaper rates are too high. The contracts for shipping woodchips may well be telling evidence for that proposition, but the contracts themselves are not alleged in any way to have been consummated in violation of the antitrust laws. Indeed, according to plaintiffs' complaint, the contracts were entered into as a product of free competition. The district court therefore properly dismissed the count of plaintiffs' complaint relating to

---

**2.** Article 2 states:
There shall be no undue preference or advantage nor unreasonable discrimination against any consignor or consignee by any of the parties hereto.

**622**

woodchip rates on the grounds that it failed to state a claim.

Affirmed.