759 F.2d 1305
 1985-1 Trade Cases 66,571
 In the Matter of WHEAT RAIL FREIGHT RATE ANTITRUST LITIGATION.
Appeals of LITTLE CROW MILLING CO., INC., Midstate Mills
Inc., DCA Food Industries Inc., General Mills,
Inc., and The Pillsbury Company.
 Nos. 84-1383, 84-1449 and 84-1505.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 14, 1984.
Decided April 17, 1985.
As Amended May 20, 1985.
 
 Ralph Sauarese, Howrey & Simon, Washington, D.C., for plaintiffs.
 Steve McGisech, U.S. Dept. of Justice, Washington, D.C., for amicus curiae.
 Laurence Z. Shiekman, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for amicus curiae.
 Before BAUER and COFFEY, Circuit Judges, and DOYLE, Senior District Judge.*
 BAUER, Circuit Judge.
 
 
 1
 In this multidistrict antitrust litigation, certain plaintiff shippers of wheat and wheat products appeal from the district court's order holding the defendant railroads impliedly immune from antitrust liability under the Sherman Act Sec. 1, 15 U.S.C. Sec. 1 (1976), for allegedly conspiring to fix the price of wheat rail freight rates filed with and approved by the Interstate Commerce Commission (ICC). 579 F.Supp. 517. We affirm the district court's finding of implied immunity for the railroads from antitrust liability and uphold the dismissal of the suit.
 
 
 2
 * In 1950, the ICC approved the defendant railroads' Agreement of the Eastern Railroads Under Section 5b of the Interstate Commerce Act (Agreement), which provided that rail carriers who were members of the Agreement could periodically meet and jointly set freight rates following the procedures outlined in the Agreement. Under the Interstate Commerce Act, 49 U.S.C. Sec. 10706(a)(2)(A) (Supp. III 1979) (ICA), two or more rail carriers may enter into an agreement relating to rates. The carriers must submit the agreement to the ICC for approval, and, if it is approved and carried out under the conditions required by the Commission, the railroads will not be subject to antitrust liability "with respect to making or carrying out the agreement." Id. See Eastern Railroads Agreement, 277 I.C.C. 279 (1950).
 
 
 3
 The railroads' 1950 Agreement prescribes procedures that the carriers must follow before filing a proposal on rates or other matters with the ICC. The members of the Agreement must give public notice of a rate proposal in a recognized traffic publication. Agreement, Art. III, Sec. 2. All interested persons, including shippers, are given fourteen days from the date of publication to communicate their views on the proposal to the members' designated committee and its chairman. Id. If the chairman receives no objection to the proposal within fourteen days, it is presumed that all members have approved the proposal. Id. Sec. 5. If an interested person does object, the chairman makes a proposal for a hearing at the members' next meeting. Id. Sec. 6. At the meeting, shippers and other interested parties have an opportunity to be heard regarding the proposed rate structure. Id. Sec. 8. The committee votes on the rate plan after having heard the views of the interested parties. Finally, the parties may seek review of the committee's decision by the Traffic Executive Association.
 
 
 4
 In 1976, the ICC, reviewing the railroads' existing plan set pursuant to the Agreement for wheat freight rates from Chicago to the east, held that the plan illegally discriminated against cargo shipped to Chicago by motor carrier. Board of Trade of the City of Chicago v. Akron, 352 I.C.C. 881 (1976), aff'd Atchison, Topeka & Santa Fe Railway v. United States, 549 F.2d 1186 (8th Cir.), cert. denied, 434 U.S. 874, 98 S.Ct. 223, 54 L.Ed.2d 154 (1977). In response to this decision, the railroads submitted wheat freight rate Plan A to the ICC, which eliminated proportional rates on wheat shipments in favor of higher flat rates.[1] In August, 1978, the ICC suspended Plan A and initiated an investigation of the Plan pursuant to its statutory authority under 49 U.S.C. Sec. 10707(a). The railroads thereafter cancelled the Plan A tariffs and, in February, 1979, filed wheat freight rate Plan B with the ICC. The defendant railroads adopted Plan B without giving public notice or holding a hearing regarding Plan B. Plan B was filed with the ICC, which initiated an investigation but refused to suspend Plan B pending the investigation. Transit on Wheat Between Reshipping Point and Destination, No. 37146 (March 16, 1979) (Transit on Wheat I ).
 
 
 5
 Under Plan B, all transit shipments of wheat were to be charged a flat rate, and all nontransit shipments, a proportional rate. A transit shipment is one in which a shipment is interrupted while the shipped goods are taken off the carrier for storage or processing and then returned to a carrier to proceed to their destination. A nontransit shipment is uninterrupted. Previously, transit shippers paid the lower of the proportional or flat rate plus a separate fee for the transit privilege.[2] Plan B eliminated the transit privilege for proportional rate shipments. If a shipper chose the lower proportional rate for a transit shipment, that rate applied only to the intermediate transit destination; the flat rate applied to the remainder of the journey. Only if the shipper chose the higher flat rate could he use the transit privilege and apply the through rate.
 
 
 6
 The shippers sought review by the ICC of the carriers' failure to give notice and a hearing. The protesting shippers alleged that, with respect to Plan B, the railroads had failed to comply with the notice and hearing provisions regarding rate proposals of the Agreement which provide shippers an opportunity to comment to the rail carriers about the proposals. See Agreement, Art. III, Sec. 2. The railroads responded that they were exempted from the notice and hearing provisions because the rejection by the ICC of Plan A constituted an emergency and because notice and hearing are excused when a proposal is of "such emergency character that the customary procedure as provided herein cannot reasonably be followed," id. at Sec. 8, or when changes in rates grow "out of decisions of and orders by the Interstate Commerce Commission." Id. at App. p 8. On January 16, 1980, the ICC approved Plan B. The ICC agreed with the shippers that the Plan B was not of an emergency character and that the decision to eliminate transit privileges did not grow out of the previous ICC decision. The ICC excused compliance with the Agreement procedures, however, because it found that the exceptions to the notice and hearing requirements in the Agreement were vague and because it found that the shippers had received constructive notice of Plan B.
 
 
 7
 On appeal, a panel of this court reversed the ICC, holding that the ICC could not approve the proposal if the railroads did not comply, and were not exempt from complying with, the Agreement. Board of Trade v. ICC, 646 F.2d 1187, 1191-93 (7th Cir.1981). On remand, the ICC held that the railroads had violated the Agreement by failing to conform to its procedures and ordered the tariff cancelled within 30 days. The ICC refused, however, to grant the shippers' request to declare the Plan B rates void ab initio. The ICC further refused to award reparations to the shippers, finding that they had failed to demonstrate "actual injury flowing from the carriers' unlawful tariff publication." Transit on Wheat Between Shipping Point & Destination, 365 I.C.C. 890 (1982) (Transit on Wheat IV ).
 
 
 8
 Rather than appeal the ICC's decision regarding reparations, the shippers filed the present suit in the federal district court alleging that the railroads' conduct in jointly meeting and conspiring to fix the Plan B rates constituted a per se violation of the antitrust laws. The shippers alleged further that the railroads had lost their immunity from antitrust laws provided by section 10706(a)(2)(A) when they failed to follow the notice and hearing requirements of the Agreement. The district court dismissed the shippers' antitrust damage claims on the grounds that the railroads were impliedly immune from antitrust liability for their conduct.[3]II
 
 
 9
 Section 10706(a)(2)(A) of the Interstate Commerce Act (ICA), 49 U.S.C. Sec. 10706(a)(2)(A), provides rail carriers with express immunity from antitrust liability for implementing agreements for joint rate setting approved by the ICC.[4] The district court found and the facts in the record indicate that the carriers in this suit did not carry out the 1950 Agreement, but rather violated it, when they adopted Plan B without giving public notice and holding a hearing pursuant to Article III of the Agreement after the ICC suspended and began to investigate the carriers' Plan A. Thus, the language of the ICA does not expressly immunize the conduct of the carriers from the reach of the antitrust laws.
 
 
 10
 The district court held, however, that despite the lack of express immunity under the ICA, the carriers were nonetheless impliedly immune from antitrust liability. In determining that the railroads were impliedly immune from antitrust liability for their failure to follow the 1950 Agreement procedures in adopting Plan B, the court relied principally upon the Supreme Court's decision in Keogh v. Chicago & Northwestern Railway, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). In Keogh, the Court held that a shipper cannot recover antitrust treble damages based upon a claim that, but for an alleged conspiracy among carriers, the shipper would have been entitled to transportation rates lower than the rates which were filed with and approved by the ICC. Keogh involved an antitrust suit brought by a flax and excelsior shipper against railroad carriers, alleging that the carriers had conspired through their committee, the Western Trunk Line Committee, to fix excessive rates. The challenged rates had been filed, suspended, investigated, and finally approved as reasonable and nondiscriminatory by the ICC. The shippers claimed that under section 7 of the Sherman Act they were entitled to lost profits, as well as treble damages based on the difference between the old and new rates. Keogh, 260 U.S. at 160, 43 S.Ct. at 48.
 
 
 11
 A unanimous Court held that a private shipper could not maintain an antitrust cause of action based on rates approved by the ICC. The Court did not frame its inquiry in terms of implied immunity. Rather, the Court treated the question as one of an accommodation of antitrust and regulatory goals, with a focus on the propriety of the alternative regulatory remedies offered for the allegedly injurious conduct at issue. Three considerations shaped the Court's conclusion. The Court first noted that, because the Act to Regulate Commerce provided for a recovery of damages for any illegal rate, an additional remedy under the antitrust laws for damages for illegal rates would be redundant. The Court, therefore, reasoned that it would be anomalous to assert that an antitrust remedy was available for rates found to be legal by the Commission. Id. at 162, 43 S.Ct. at 49. Second, the Court determined that permitting antitrust suits would foster the very unjust discrimination that the Act to Regulate Commerce sought to eliminate. Damages recovered in suits by shippers would act as a rebate, giving victorious litigious shippers economic preferences over their trade competitors. Id. at 163, 43 S.Ct. at 49. Third, the Court stated that the injury complained of rested on a hypothesis that a particular lower rate would have been approved by the Commission. Such an hypothesis was unprovable. Damages were also speculative because it was impossible to say that a lower rate would have benefited the shipper if all other shippers were also afforded the lower rate. Id. at 164-5, 43 S.Ct. at 50.
 
 
 12
 The parties to this case agree that the resolution of the implied immunity question at issue here depends upon the extent of the application of the Keogh doctrine to this case. We believe Keogh is fully applicable to this case. The shippers and amicus, the Department of Justice of the United States, however, argue that the Keogh doctrine is no longer applicable to the facts of this case. The shippers argue that the Railroad Revitalization Regulatory Reform Act of 1976, Pub.L. 94-210, 90 Stat. 31 (1976) (the 4R Act), changed the regulatory environment in which the railroads operate from that under which they operated at the time of Keogh, thereby invalidating the doctrine's usefulness in this case.
 
 
 13
 We find, however, that the Supreme Court has continued to favorably refer to the Keogh doctrine in the sixty years since its creation. In Georgia v. Pennsylvania Ry. Co., 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945), the Court cited Keogh for the proposition that a state could not sue for damages for an alleged conspiracy by railroad carriers to fix rates because "[t]he legal rights of a shipper against a carrier in respect to a rate are to be measured by the published tariff." Id. at 453, 65 S.Ct. at 724. See also McLain v. Real Estate Board of New Orleans, 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980) (court's jurisdiction not impaired, though an inability to prove damages exists under Keogh ); Hawaii v. Standard Oil Co., 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972) (discussing Georgia v. Pennsylvania R.).
 
 
 14
 Furthermore, this court has applied the Keogh doctrine twice in recent decisions. In an earlier case involving Plan B this court reaffirmed the significance of the notice and hearing requirements of the Agreement and held that it was error for the ICC to have approved the tariff schedule if it found that the (5)(b) notice and hearing procedures were applicable but were not followed. Board of Trade v. I.C.C., 646 F.2d 1187 (7th Cir.1981). The court therefore remanded, and, on remand, the ICC disapproved Plan B, as outlined above.
 
 
 15
 In explaining the significance of ICC enforcement of procedural requirements of the rate setting agreement of railroad carriers, this court partially relied on the assumption that section 10706(a)(2)(A) immunity follows the initial approval of the collectively fixed rate. This court reasoned that the Interstate Commerce Act was created to reduce cutthroat competition in the transportation industry by allowing competitors to engage in joint price setting activity free from antitrust liability. The notice and hearing requirements of the Agreement were an integral part of this conferral of immunity because they "diminish[ed] the possibility of harm to shippers inherent" in such joint rate setting activity. Board of Trade, 646 F.2d at 1193. Moreover, "even if the conference procedures, which Congress considered necessary to justify immunity from the antitrust laws are not followed, antitrust immunity inures if the ICC fails to correct that noncompliance but approves the rate."This circuit also recently reaffirmed the validity of Keogh in Minsky v. Auto Driveway Co., 757 F.2d 718 No. 82-1972 (7th Cir. April 18, 1984) (publication pending). In Minsky, a class of plaintiffs sought treble damages for alleged violations of the Sherman and Clayton Acts by one-way automobile delivery agencies after the agencies had either pled or been found guilty of a criminal combination and conspiracy to fix auto rates for driveaway services in violation of antitrust laws. This court affirmed the district court's dismissal of the suit and held that
 
 
 16
 "Keogh is still valid law.... A tariff that is filed with the ICC and which becomes effective is the legal rate and establishes the legal rights of the parties until it is determined by the ICC to be unreasonable or discriminatory. A customer of a carrier, who was charged the filed rate, cannot maintain an antitrust suit against the carrier for an alleged conspiracy in setting the rate.
 
 
 17
 Id. at 720 (emphasis in original).
 
 
 18
 Moreover, we find unpersuasive the shippers' and the Department of Justice's arguments that the changed regulatory environment invalidates Keogh. Under the 4R Act, the ICC no longer has the authority to determine whether a rate is reasonable unless it first finds that the railroads at issue have market dominance. 49 U.S.C. Sec. 1(5)(b) (1976) (recodified in 1978 to 49 U.S.C. Sec. 10709(c)). Congress enacted the 4R Act to "reform ... the cartel structure of the industry resulting from the rate bureaus." S.REP. No. 499, 94th Cong.2d Sess. 14 (1976), reprinted in 1976 U.S.CODE CONG. & AD.NEWS at 28. Consequently, the antitrust laws were to play an expanded role: Congress mandated that the railroad "industry must be treated more like a competitive industry with respect to antitrust policy." Id. The Commission's reduced authority over rates where the carriers do not possess market dominance is emphasized by the shippers and amicus; they argue that in the absence of this authority to declare rates reasonable, the antitrust laws must be given greater force than they were given in Keogh to govern the competition within the carrier industry. Thus, shippers and amicus argue that antitrust exemptions should not be implied absent a clear showing that antitrust relief would frustrate regulatory policy.
 
 
 19
 While we agree that through the 4R Act Congress introduced a measure of market competition into the formerly pervasively regulated field of rail carrier rate making, it is not correct to say that ICC authority over rates is completely eliminated by the 4R Act. There are two major prongs of the ICC's jurisdiction over common carrier rates. Under the first, the ICC is empowered to determine whether a rate is unreasonably high or low. 49 U.S.C. Sec. 10701(a) (Supp. II 1978). Under the second, rates must not unjustly discriminate against shippers, commodities, or geographic regions. 49 U.S.C. Sec. 10741(a), (b) (Supp. II 1978). The 4R Act amended the ICC's authority to declare rates unreasonably high; however, the antidiscrimination provisions were unaffected. The legislative history confirms that the new standards for ICC review of rate reasonableness do not affect the other standards for ICC determinations of lawfulness, including the prohibition on discriminatory rates. S.Rep. No. 595, 94th Cong.2d Sess. 148, reprinted in 1976 U.S.CODE CONG. & AD.NEWS 163. The Supreme Court in Keogh recognized that the ICC's jurisdiction to prevent unjust discrimination in rates was the "paramount purpose of Congress" in enacting the Interstate Commerce Act. Keogh, 260 U.S. at 163, 43 S.Ct. at 49. Moreover, in ICC v. American Trucking Association, --- U.S. ----, 104 S.Ct. 2458, 81 L.Ed.2d 282 (1984), the Supreme Court held that the ICC has the primary administrative responsibility for ensuring that carriers adhere to rate agreement procedures and that, should the ICC find a transgression, it can determine whether the extraordinary remedy of retroactive rate nullification is appropriate.
 
 
 20
 This study of Supreme Court precedent and decisions in this circuit persuades us, therefore, that while references to the Keogh doctrine are glancing ones, the assumption throughout the cases is that Keogh today, as in 1922, is good law. The 4R Act, moreover, has not so drastically altered the regulatory environment as to invalidate the principles operating behind the Keogh decision. Finally, a consideration of the interplay of Congressional antitrust goals and Congressional regulatory goals leads us to conclude that the regulatory policies governing the railroads here are incompatible with antitrust enforcement.
 
 
 21
 In enacting regulations to govern certain industries, Congress has, as we have seen above, granted express immunity from the antitrust laws for certain conduct by regulated firms. In general, the antitrust laws are premised on the theory that "the unrestrained interaction of competitive forces will yield the best allocation of our economic resources," Northern Pac. Ry. v. United States, 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958), while the theory of regulation is that the public interest is best served by the restraint of competition in certain industries, such as utilities. See generally P. Dempsey, Rate Regulation and Antitrust Immunity in Transportation: The Genesis & Evolution of This Endangered Species, 32 AM.U.L.REV. 335 (1983) (discussing the history of the regulation of transportation and urging the continuation of immunity); Note, AT & T and the Antitrust Laws, 85 YALE L.J. 254 (1975) (arguing that AT & T should not be immune under the antitrust laws). Where Congress has failed to anticipate conduct and declare it immunized, a court, faced with an antitrust claim against a regulated firm based on this conduct, must craft a new particularized accommodation between the goals of the antitrust laws and the goals of regulation. If the court determines that the application of the antitrust laws to the challenged conduct would be contrary to the regulatory goals, then it creates an implied immunity to shield the regulated firm from antitrust liability. The accommodation of antitrust laws and economic regulation of certain industries is a task frequently before this and other courts. Deference to the goals of the antitrust laws, however, requires that such implied immunity not be conferred lightly by the courts. MCI Communications v. American Telephone & Telegraph Co., 708 F.2d 1081, 1102 (7th Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983).
 
 
 22
 In MCI, this circuit's most thorough recent examination of the principles of implied immunity, MCI challenged AT & T's conduct in setting prices and requiring AT & T interface devices as violative of the antitrust laws despite the fact that AT & T's conduct was regulated by the Federal Communications Commission (FCC) and that both practices at issue in the case had been filed and approved as tariffs with the FCC. In considering whether to imply immunity, a panel of this court discussed the interplay between the antitrust laws and regulation.
 
 
 23
 It is well-established ... that regulated industries are not per se exempt from the Sherman Act. Repeal of the antitrust laws by implication is not favored and not casually to be allowed. Only where there is a plain repugnancy between the antitrust and regulatory provisions will repeal be implied.... [R]epeal is to be implied only where necessary to make the regulatory scheme work, and even then, only to the minimum extent necessary.
 
 
 24
 MCI Communications v. American Telephone & Telegraph Co., 708 F.2d at 1102 (citations omitted). In holding AT & T's conduct to be not impliedly immune, this court established that in order to imply antitrust immunity for a regulated industry, a court must find either:
 
 
 25
 (1) [that] the activities that are the subject of [plaintiffs'] complaint were required or approved by the ... Commission, pursuant to its regulatory authority, in a way that is incompatible with antitrust enforcement, ... or (2) [that] these activities are so pervasively regulated "that Congress must be assumed to have foresworn the paradigm of competition."
 
 
 26
 Id. at 1102 (citations omitted). In MCI, this court concluded that enforcing the antitrust laws against AT & T would not be incompatible with the regulatory goals of the FCC because the FCC had neither dictated nor approved of AT & T's pricing decisions.
 
 
 27
 The district court concluded that, because of the 4R Act, it was not true that rail carriers' activities were so pervasively regulated that "the paradigm of competition" had been foresworn by Congress for the rail industry. Id. We agree with this conclusion based on our study of the 4R Act as outlined above. Thus, implied immunity cannot be conferred on the basis of the second MCI rationale for implied immunity.
 
 
 28
 The district court, however, concluded that the factors discussed in Keogh which suggest an incompatibility between regulatory and antitrust goals also support a finding of implied immunity in this case. This incompatibility meets the first MCI rationale for implied immunity. The district court concluded that, as in Keogh, the shippers' antitrust damages were necessarily speculative, the availability of a reparation remedy through the ICC bars recovery of antitrust damages, and the processing of suits such as the instant case would undermine carrier reliance on ICC decisions and cause further discrimination among customers. Amicus and the shippers argue that these factors are no longer "of sufficient moment" to justify implied immunity from the antitrust laws.
 
 
 29
 The shippers argue that damages are not speculative in this case. They argue that the antitrust violation at issue here was not the carriers' failure to provide notice and a hearing before submitting Plan B to the ICC, but the collective fixing of rates itself inherent in formulating Plan B. The shippers argue that once the carriers had ceased to comply with the procedures of the ICC the cloak of antitrust immunity fell from all their activities. The shippers assert that damages for these allegedly illegal price fixing activities can be measured in the same way as other price fixing damages are calculated, such as by comparing the pre-conspiracy price or the post-conspiracy price with the allegedly unlawful price. The shippers argue, moreover, that this calculation of the post and pre-conspiracy prices need not be exact, so long as it is "just and reasonable."
 
 
 30
 The district court rejected the shippers' argument. The Court in Keogh had found that damages were speculative because the illegal conspiratorial rate might not "conform to the requirements of the Act to Regulate Commerce" and that it would be impossible to obtain an advisory opinion from the agency settling this point. The district court reasoned that it was confronted in this case by the same speculative situation as that which faced the Court in Keogh. The court would have had to determine whether a "different rate would have been passed by the railroads [and] whether the ICC would have approved this other rate." The shippers argue vigorously that the lack of authority on the ICC's part to determine the reasonableness of rates reveals the error of the district court's conclusion.
 
 
 31
 We have found, however, that the ICC still maintains extensive jurisdiction over railroad rates. The ICC continues to have authority to review rates and to determine whether the rates are discriminatory. The history of this very case illustrates the extent to which the railroads do not operate in a purely competitive market, but rather are subject to the persistent overview of the ICC. Finding a post-conspiracy or pre-conspiracy rate approved by the ICC, to which the rate at issue could be compared for the sake of determining damages, is an impossibly speculative task. Such a rate would have had to have been developed by the shippers and submitted to the ICC for approval as non-discriminatory and procedurally correct. It is impossible for this or any court to conclude with any reasonable certainty what the ICC would have found to be a non-discriminatory rate. Thus, proof of damages is speculative in this case, just as it was in Keogh.
 
 
 32
 The district court also concluded that the availability of a reparation remedy through the ICC bars recovery of antitrust damages. The shippers rely on Carnation Co. v. Pacific Westbound Conference, 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966), and Mt. Hood Stages, Inc. v. Greyhound Corp., 555 F.2d 687 (9th Cir.1977), vacated on other grounds, 437 U.S. 322, 98 S.Ct. 2370, 57 L.Ed.2d 239 (1978), to argue that the existence of an administrative remedy for conduct which is also an antitrust violation is no bar to the maintenance of an antitrust action. The shippers' reliance on these two cases is misplaced. In Carnation, the Supreme Court held that the antitrust remedies were permissible because they were "entirely collateral," to the administrative remedies, 383 U.S. at 224, 86 S.Ct. at 787-88, but Carnation involved the Federal Maritime Commission, an agency which did not have the authority to grant the plaintiff the damage relief that it sought. In contrast, the ICC in this case is authorized to grant reparation damages.
 
 
 33
 In Mt. Hood, the Ninth Circuit granted antitrust damages to Mt. Hood, a competitor of Greyhound in the Western States, and refused immunity because, in part, the Commission found that Greyhound's conduct had not been approved and had continued to disapprove of its anticompetitive conduct. The Ninth Circuit noted the distinction between the facts in Mt. Hood and the situation in Hughes Tool Co. v. TransWorld Airlines, Inc., 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973). In Hughes, immunity was granted where conduct had been approved, and the Ninth Circuit found this distinction critical: "in Hughes Tool, the regulatory agency involved had considered the conduct which underlay the antitrust complaint and had approved it as in the public interest; a successful antitrust suit therefore necessarily would have been repugnant to operation of the regulatory scheme." Mt. Hood, 555 F.2d at 693 (footnote omitted).
 
 
 34
 In this case, as in Hughes Tool, the ICC initially approved Plan B. Even when the ICC ordered the Plan B tariffs cancelled because the railroads had failed to follow the procedures of the Agreement, the ICC refused to declare the Plan B tariffs void ab initio. Moreover, the shippers were given ample opportunity to present their arguments to the ICC to strike the tariffs and to demonstrate the injuries suffered by them pursuant to those tariffs. Upon considering these claims, however, the ICC concluded that the shippers had not established an injury:
 
 
 35
 In short, the shippers have not demonstrated any equitable reason why in the circumstances of this case, reparations should be awarded on the basis proposed. Nor have they established actual injury flowing from the carriers' unlawful tariff publication. We, therefore, conclude that in these circumstances reparations are not appropriate absent a showing of injury.
 
 
 36
 Transit on Wheat IV, 365 ICC at 898-99 (1982). A remedy was clearly available to the shippers before the ICC for any injury that they might have suffered because of the failure to follow the procedures of the Agreement. The shippers were given the opportunity to prove injury, but they could not demonstrate to the ICC's satisfaction that they had been harmed. Rather than seek review of the ICC's adverse findings they chose instead to file the instant complaints. We conclude, therefore, as in Hughes Tool, that a successful antitrust suit would be repugnant to the operation of the regulatory scheme. The availability of ICC reparations would sufficiently reward the shippers, should they be able to prove any injury.
 
 
 37
 The shippers also challenge the district court's finding that allowing antitrust suits in the circumstances of this case would undermine carrier reliance on ICC decisions. The district court reasoned that, "[i]f this suit were allowed to proceed, a carrier could never rely on a determination by the ICC.... If regulated carriers cannot rely on the ICC's decisions, then the role of the ICC is severely restricted and the goals of the Interstate Commerce Act are frustrated." While it is true that in one sense permitting antitrust damages to be obtained by shippers from carriers also might help to enforce the Agreement and thus, presumably the Interstate Commerce Act, the availability of reparations also serves this need. Moreover, the effect of such damages would not stop there. In this case, the ICC initially had approved Plan B and subsequently refused to declare the rates void ab initio. Once the ICC had approved the rates, the carriers could charge only that rate and no other. To subject the carriers to retroactive antitrust liability for rates later declared unlawful would place carriers in a position of "great uncertainty." See National Association of Recycling v. American Mail Line, Ltd., 720 F.2d 618, 620 (9th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 1616, 80 L.Ed.2d 144 (1984) (citations omitted). Carriers would never be able to rely on ICC approval of rates until all appeals on initial ICC decisions had been decided. Then, if such appeals resulted in the rates being declared unlawful, the carriers would be forced to pay treble damages even though the rates had been initially approved and they had been required to charge only those rates. We do not think that it was the goal of the ICA to trap carriers into such retroactive antitrust liability for engaging in conduct required by the ICA. The imposition of antitrust liability for this conduct would only frustrate the goal of the ICA. See Dempsey, 32 AM.U.L.REV. at 372-75 (arguing that antitrust liability for collective rate making by carriers would weaken and overburden the ICC, creating a risk of increased discrimination).
 
 
 38
 Finally, the shippers do little to persuade us that there are good reasons why the antitrust laws should apply to the highly regulated railroad industry under the particular circumstances of this case. As this court has noted recently,
 
 
 39
 [t]he purpose of the antitrust laws as it is understood in the modern cases is to preserve the health of the competitive process--which means ... to discourage practices that make it hard for consumers to buy at competitive prices--rather than to promote the welfare of particular competitors. This point was implicit in the famous dictum of Brown Shoe Co. v. United States, 370 U.S. 294, 320 [82 S.Ct. 1502, 1521, 8 L.Ed.2d 510] (1962), that antitrust law ... is concerned with "the protection of competition, not competitors." (Emphasis in the original.) ... If no consumer interest can be discerned even remotely in a suit brought by a competitor--if a victory for the competitor can confer no benefit, certain or probable, present or future, on consumers--a court is entitled to question whether a violation of antitrust law is being charged.
 
 
 40
 Brunswick Corp. v. Reigel Textile Corp., 752 F.2d 261, 266-67 (7th Cir.1984).
 
 
 41
 We cannot discern under the facts of this case how permitting antitrust suits to be filed against carriers who fail to follow the procedures of their Agreement promotes competition or provides some benefit to the ultimate consumer of the railroads' services. The question in fact seems to answer itself as soon as one considers the level of regulation governing the railroad industry. To subject railroads to treble damages for a failure to follow the procedures of their Agreement might aid competitors, at least those who win their antitrust suits, but it does nothing to promote competition. Railroads must, pursuant to their agreement, collectively discuss and fix the rates to be charged for rail freight. Increased competition, in the sense of gaining a lower price or some other benefit for the consumer, could not be the result of an imposition of antitrust liability for failure to follow the procedures for collectively fixing these rates. Nor can we see any benefit to the ultimate consumer for permitting antitrust liability to serve as a sort of watchdog to guarantee procedural propriety among carriers engaged in collective rate fixing. The regulation of the railroad industry by the ICC prevents the antitrust laws from having their intended effect of increasing competition and benefitting consumers. To uphold antitrust liability here, then, would fail to promote the goals of the antitrust law while frustrating regulatory policy in the sense of creating uncertainty among carriers regarding liability for the very collective rate making activity in which they are obliged to engage.
 
 
 42
 In conclusion, therefore, we find that the reasoning and conclusions of the Supreme Court in Keogh are still valid and applicable today. Under the Keogh doctrine, for the reasons enunciated above, we find that the railroad carriers are impliedly immune from antitrust liability for rates submitted to and initially approved by the ICC despite the carriers' failure to follow the Agreement procedures for fixing those rates. The order of the court dismissing the shippers' antitrust suit is affirmed.
 
 
 43
 AFFIRMED.
 
 
 
 *
 The Honorable James E. Doyle, Senior Judge of the United States District Court for the Western District of Wisconsin, is sitting by designation
 
 
 [1]
 A flat rate is a local rate of one or more carriers. A proportional rate is a portion of the through rate based on a percentage and/or differential over or under the Chicago to New York rate. Proportional rates are generally lower than flat rates between the same points
 Board of Trade of City of Chicago v. ICC, 646 F.2d 1187, 1189 (7th Cir.1981).
 
 
 [2]
 For a thorough discussion of the distinction between proportional and flat rates, and the history of the railroad rate structure in the central Midwest region, see Board of Trade of City of Chicago v. ICC, 646 F.2d 1187, 1189 (7th Cir.1981)
 
 
 [3]
 The district court ruled on other motions by the parties for summary judgment in its opinion in this case. The court denied defendants' motion for summary judgment on the basis of the exclusive jurisdiction of the ICC, reasoning that the time for appealing the ICC decision had expired and that the antitrust laws protect rights collateral to those protected by the ICA. The district court also rejected the defendants' argument that because certain shippers had elected to pursue the ICC remedy of damages they were barred from seeking damages under the antitrust laws. The court found that the shippers had not in fact elected their remedy because not all of the shippers requested reparations from the ICC. It appears that some shippers may have alluded to reparations. The ICC itself was "unclear" as to who had requested reparations, but ruled that none were appropriate. The district court also granted the shippers' motion to strike the carriers' Noerr-Pennington affirmative defense on the ground that the filing of a tariff itself cannot be a "petition" to the government. The court also granted the shippers' motion in limine that the carriers' conduct be deemed per se illegal since it is not exempt from the antitrust laws. Finally, the court denied the carriers' motion to hold the shippers collaterally estopped to seek damages in this action because the ICC had determined that the shippers had suffered no injury. First, the court found that not all shippers in this suit had participated in the ICC proceeding. Second, the court held that, even to the extent that shippers had participated, the ICC was not empowered to define antitrust injury and, therefore, a different issue was before the district court than had been before the ICC. The parties, however, do not challenge these decisions of the district court with the exception of Pillsbury, who challenges the court's holding with regard to the election of remedies. Because of our holding on implied immunity, it is not necessary to discuss this portion of the district court's order
 
 
 [4]
 The Interstate Commerce Act, 49 U.S.C. Sec. 10706(a)(2)(A) provides:
 A rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission ... that is a party to an agreement of at least 2 rail carriers or an agreement with a class of carriers ... that relates to rates, ... classifications, divisions, or rules related to them, or procedures for joint consideration, initiation, publication, or establishment of them, shall apply to the Commission for approval of that agreement.... If the Commission approves that agreement, it may be made and carried out under its terms and under the conditions required by the Commission, and the Sherman Act (15 U.S.C. 1, et seq.) [and] the Clayton Act (15 U.S.C. 12, et seq.) ... do not apply to parties and other persons with respect to making or carrying out the agreement.